### ALFRED J. BROWN SEED CO. *v*. BROWN.

1. CORPORATIONS—BILLS AND NOTES—ACCOUNTING—WHERE SALES OF STOCK CANCELED NOTES GIVEN THEREFOR MAY NOT BE COLLECTED.

Where, in a suit by a corporation against its directors for an accounting, it appears that the capital stock was increased, some of which was sold to defendants, for which they gave their notes, but said sales were disapproved by the capital issues committee, created by act of Congress (40 U. S. Stat. pp. 506, 512), the stock was recalled, and

[1]Corporations, 14 C. J. § 901 (Anno).

the notes were given up and canceled, defendants may
not now be compelled to pay them.

2. SAME—ASSETS OF CORPORATION A TRUST FUND FOR CREDITORS.
As between the stockholders of a corporation and its cred-
itors, the assets of the corporation are, in a sense, a trust
fund for the payment of its debts, and they cannot lawfully
be distributed among the stockholders, even in part, to
the prejudice of creditors.

3. SAME—DIVIDENDS MAY BE DECLARED OUT OF SURPLUS ONLY.
A corporation cannot lawfully declare dividends out of its
capital stock, and thereby reduce same, or out of assets
which are needed to pay the corporate debts, but they may
be declared only out of surplus profits.

4. SAME—ACCOUNTING—STOCKHOLDERS REQUIRED TO ACCOUNT FOR
DIVIDENDS ILLEGALLY PAID.
Where directors of a corporation declared a stock dividend
of 100 per cent. at a time when its condition did not
warrant it, they are required to account for cash dividends
thereafter paid thereon, and said stock is treated as elimi-
nated.

5. SAME—SALE OF CORPORATE PROPERTY TO DIRECTORS CAREFULLY
SCRUTINIZED.
A transaction by which directors, purporting to represent
the corporation, sold to themselves individually valuable
property of the corporation, calls for the most careful
scrutiny.

6. SAME—DIRECTORS REQUIRED TO ACCOUNT FOR DIFFERENCE BE-
TWEEN ACTUAL VALUE AND PRICE PAID.
Where directors of a corporation sold to themselves a re-
tail store belonging to the corporation for $6,156.71, which
was less than it was worth, they are required to account
for the difference between that sum and $15,000, which
correspondence between them at the time discloses was
their estimate of its then value.

7. SAME — SURRENDER OF LIFE INSURANCE POLICIES NOT DETRI-
MENTAL TO CORPORATION.
The surrender by the corporation of life insurance policies
on the lives of directors, who paid to the corporation the

²Corporations, 14 C. J. § 1476; ³Id., 14 C. J. § 1209; L. R. A. 1915D,
1053; 7 R. C. L. 283; 4 R. C. L. Supp. 477; 6 R. C. L. Supp. 440;
⁴Id., 14a C. J. § 1870; ⁵Id., 14a C. J. §§ 1887, 1880; ⁶Id., 14a C.
J. § 1880; ⁷Id., 14a C. J. § 1880.

cash surrender value and took them over, *held*, under
the circumstances, not detrimental to the corporation.

8. SAME — DIRECTORS REQUIRED TO ACCOUNT FOR INCREASE OF
SALARIES BEYOND WHAT SERVICES WORTH.

Directors of a corporation who voted to increase their
salaries as officers beyond what their services were worth
are required to account for the money so received as in-
creased salaries.

9. SAME—SALE OF STOCK TO CORPORATION VOID, WHERE IT HAD
DEFICIT.

In a suit for an accounting, where it appears that a
director, owing the corporation on notes, drew large sums
of money in dividends and salary, but made no attempt
to pay said indebtedness until the corporation faced a
large deficit which greatly reduced the value of the stock,
when he surrendered stock, which was daily growing less
valuable, and had his indebtedness canceled, he is required
to pay said indebtedness.

10. FRAUD—RESCISSION FOR FRAUD MUST BE PROMPT—ACTION FOR
FRAUDULENT TRANSACTIONS WITHOUT RESCISSION MAY BE
BROUGHT WITHIN PERIOD FIXED BY STATUTE OF LIMITATIONS.

One who seeks to rescind a contract for fraud must act
promptly upon discovering the fraud, and place the other
party *in statu quo*, but one suing for fraud, or seeking
an accounting for fraudulent transactions without rescis-
sion may do so within the period fixed by the statute of
limitations. .

11. CORPORATIONS—FRAUD—ACCOUNTING—LACHES.

In the instant suit evidence *held*, not to show that plain-
tiff was guilty of laches.

12. SAME—ACCOUNTING—FRAUD—JUDGMENT—ESTOPPEL.

Where a director of the corporation agreed with a repre-
sentative of the board of directors to place with it his
stock for voting purposes, but failed to do so, a suit for
specific performance thereof and a consent decree therein
based on a stipulation agreement that the parties "had
adjusted their differences" did not estop plaintiff from
maintaining the instant suit; none of the differences here
involved being involved or discussed in the prior suit.

---

⁸Corporations, 14a C. J. § 1908; 40 A. L. R. 1438; 7 R. C. L. 467;
2 R. C. L. Supp. 392; 6 R. C. L. Supp. 449; ⁹Id., 14a C. J. § 1899
(Anno); ¹⁰Accounts and Accounting, 1 C. J. § 84 (Anno); Con-
tracts, 13 C. J. §§ 671, 680; Fraud, 27 C. J. § 139; ¹¹Accounts
and Accounting, 1 C. J. § 84; ¹²Judgments, 34 C. J. § 1325.

Appeal from Kent; Dunham (Major L.), J. Submitted June 22, 1927. (Docket No. 40.) Decided October 26, 1927. Rehearing denied January 19, 1928.

Bill by the Alfred J. Brown Seed Company against Alfred J. Brown and others for an accounting. From a decree dismissing the bill, plaintiff appeals. Reversed, and decree entered for plaintiff.

*M. Thomas Ward*, for plaintiff.

*Norris, McPherson, Harrington & Waer*, for defendants.

FELLOWS, J. In 1885 Alfred J. Brown started in a small way in the business of selling seeds in the city of Grand Rapids. The business was successful and slowly and continuously developed until he had a large number of customers to whom he sold seeds at wholesale throughout the country. His son, T. Herschel Brown, when he grew old enough, became associated with him in the business. On October 21, 1913, Alfred J. Brown Seed Company, a corporation, was organized and took over the business; $100,000 of common and $100,000 of preferred were authorized; the par value of each share was $100. The common stock was all issued, 989 shares to Alfred J. Brown, 10 shares to T. Herschel Brown, and 1 share to Edward B. Seymour, bookkeeper of the company. They were elected directors of the company. Six hundred shares of the preferred was issued to Alfred J. Brown and he gave his note in payment therefor. He sold 100 shares of the preferred and the money received was applied on his note. Some of Alfred J. Brown's stock was transferred to his son Herschel, and some of the employees also acquired a few shares from him. In 1918, due to war conditions and the increased cost of seeds, more money was needed in the business, and it was planned to increase the common stock to $500,000 and the

preferred to $200,000.   On June 25, 1918, the board of directors, consisting of the two Browns and the bookkeeper, declared a 20 per cent. cash dividend and a 100 per cent. stock dividend upon the common stock. There was some delay in perfecting their plans, some of which was attributable to the creation of the capital issues committee by the act of congress of April 5, 1918 (40 U. S. Stat. pp. 506, 512).   We shall go more into detail presently.   The $200,000 of preferred stock was sold to the public.   Under normal conditions it had no voting power, and the board of directors remained the same.   Dividends were paid on the preferred and from time to time on the common.   The company borrowed large sums of money from various banks.   The bank indebtedness having reached something in excess of half a million, the bank became somewhat perturbed, and in December, 1922, they were given and assumed control over the affairs of the company for the purpose of liquidating their indebtedness, which was accomplished by converting the assets, including some real estate, into cash, and the furnishing of some money by the preferred stockholders.   This result was reached in October, 1923.   The preferred stockholders also became interested in the affairs of the company, and in March, 1923, the articles of association were amended by increasing the number of directors to seven, and Alfred J. Brown and six of the holders of the preferred stock were made directors. They did not assume the management of company affairs until after the banks had been paid.   This bill seeks an accounting from the individual defendants by reason of claimed unlawful and fraudulent acts and conduct on their part in the manipulation of corporate assets and affairs.   Upon the hearing in the court below and here, the case resolves itself into an inquiry of these questions, the relief against the A. J. Brown & Son, Inc., not being insisted upon.

This involves a consideration of various transactions and more of detail than is usually necessary as the case must be largely disposed of as one of fact. The record is voluminous, consisting of two volumes and the exhibits, many of which are audits, and has required much time and attention. In disposing of the case, we shall follow the order pursued by both counsel.

1. When the company reorganized and authorized the sale of $200,000 of preferred, it also increased its common to $500,000. Alfred J. Brown subscribed for 1,612 shares of the common and gave his note to the company for $161,200. T. Herschel Brown subscribed for 264 shares and gave his note to the company for $26,400. As appears by the records of the company, this was subject to the approval of the capital issues committee, then recently created by the act above cited. The committee disapproved of this plan, and the stock was recalled and the notes given up and canceled. It is insisted that the individual defendants should now account to the company for these notes,—should pay them. This contention can not be sustained. These subscriptions were made under a plan of reorganization expressly stated to be subject to the approval of the capital issues committee. This committee disapproved the plan, as it had a right to do under this war time measure. Having disapproved the plan proposed, it became necessary for the company to make other plans. This it did. The stock was returned to the treasury, the notes were canceled, and, with the approval of the committee, the preferred stock only was sold.

2. There was a cash dividend of 20 per cent. declared and paid on the common in the summer of 1918, and at the same time there was a stock dividend of 100 per cent. declared on the common and it was issued to the Browns who thereafter held it and drew

dividends on it.    In the summer of 1919, a 10 per cent. cash dividend was declared and paid on the common, and in the summer of 1920 a 7 per cent. cash dividend was declared and paid.    The Browns received in cash dividends on the common stock $50,616, besides their stock dividend.  ·  Counsel do not disagree as to the applicable law.    It is thus stated in 6 Fletcher Cyclopedia Corporations, § 3658:

"It is a well-settled principle that, as between the stockholders of a corporation and its creditors, the assets of the corporation are, in a sense, a trust fund for the payment of its debts, and they cannot lawfully be distributed among the stockholders, even in part, to the prejudice of creditors.    Furthermore, the amount of the capital stock of corporations is very generally fixed by their charters or by a general law, and both the State and each stockholder of the corporation, as well as its creditors, have the right to insist that it shall not be reduced or impaired by any distribution among the stockholders.    It is a settled rule, therefore, even in the absence of any statutory provision, that a corporation cannot lawfully declare dividends out of its capital stock, and thereby reduce the same, or out of assets which are needed to pay the corporate debts.    They can be declared only out of surplus profits."

Counsel for plaintiff insists that the condition of the company, as disclosed by all the audits, did not justify the declaration of these dividends or any of them, and points to the fact that a deficit existed at the end of each fiscal year, which in 1918 was made the calendar year, while counsel for defendants insist that the condition of the business when the dividends were declared, about the middle of the year, justified their declaration, and point to the fact that the audits show a surplus as of June 30th of each year.    The business of the company was a seasonal one.    In the first half of the year, money was coming in and in the last half of the year it was going out.    Counsel for defendants thus state the situation:

"During the last six months of the year less than one-fifth of the annual sales were made, and during this period an operating loss usually exceeding $100,000 was sustained. During the first six months of the year more than four-fifths of the sales were made and all of the profits of the company were realized."

It is doubtful if the loss in the last half of every year reached the figures stated; in December 31, 1918, the deficit was $38,733.90. In other years the last half of the year showed losses of upwards of $100,000. Defendants' counsel blame this condition to the system of bookkeeping used by the company under the management of the Browns. There is considerable force in this suggestion. It would probably have been better had the expenses of the new crop been put in a deferred account or added to inventory. But the condition at the end of the fiscal year, covering the full year's business, would include the "fat" as well as the "lean" periods of the year and more truly reflect the condition of the company than would the condition as of June 30th, which admittedly was the peak of the company's condition. On the 30th of June of each year the officers of the company knew they had facing them six months of loss, sometimes running over $100,000, which was as much of a fixed charge on the business as any other known expense. That this fixed charge would deplete the assets of the business they also knew, the extent of it being the only uncertainty.

As of June 30, 1918, the company was in a prosperous condition. Its financial condition justified the declaration of the cash dividend of 20 per cent. Counsel for defendants make much of the condition of the company at this time, but do not take into account in fixing the surplus the fact that the Federal taxes, estimated at $25,000, were not deducted. Deducting this amount, together with the cash dividend, the condition of the company did not authorize the declaration

of the stock dividend even if we take into consideration the figures as of this date alone.   But, in addition to this fact, is the further fact that the company was then facing a deficit during the succeeding months of the year, which would deplete its assets as certainly as any fixed charge could deplete them. While we hold that the cash dividend was validly declared, we also hold that the stock dividend was not.

On December 31, 1919, the deficit was $44,561.61; on December 31, 1920, it was $70,440.08.   This covered the full year, both fat and lean portions.   In reaching this figure, however, the capital account took into consideration the $100,000 stock dividend.   Eliminating this stock dividend, as we have, the deficit in each of these years would be turned into a surplus.   This would justify the payment of the dividend declared upon the original holdings of the Browns and to that extent it is sustained, but they must account for dividends received on the stock issued to them as a stock dividend.

3. The company owned and operated a retail store. Both before and after the transaction here involved, it made very substantial profits.   In 1921, the net profits were $6,673.73.   This did not take into account the overheads which were furnished by the company.   The books were kept at the office of the company, some deliveries were made by the company's employees, and there was supervision by the officers of the company.   It seems that the defendants were in a position to furnish definite information from which the amount of these overheads could be computed or at least approximated.   They preferred, however, in their testimony, to deal in generalities. On August 21, 1922, at a meeting of the board of directors, by the votes of Alfred J. Brown and T. Herschel Brown this retail store was sold to Alfred J.

240—Mich.—37.

Brown and T. Herschel Brown for $6,156.71, the other director, Mr. Seymour, voting against the sale. This amount appears to have been ascertained by an inventory of stock and fixtures on hand. It did not cover cash attributable to the store for working capital, which was not turned over, nor was anything allowed for value as a going concern, good will or its capacity as a money-maker for the company. That the Browns had for some time contemplated the taking over to themselves of this valuable adjunct to the company's business is demonstrated by the record. Shortly before this action was taken, Herschel wrote his father, who was away from home, a letter about it, and in this letter he fixed the value of the business at $19,000. In his testimony he denies that it was worth this amount, and further insists that he and his father did not get the cash attributed to the store for working capital which should be a large amount. But again he deals in generalities as to what that amount should be. Defendants' counsel, however, point to the fact that on December 31, 1921, the store had in cash, war savings stamps, notes, and accounts receivable, $7,963.61. But the record discloses that the retail store at Christmas time did a large business in Christmas trees and holly, requiring $5,000 to finance. The amount of cash on hand following this Christmas trade is scarcely a safe guide for the requirements at other seasons of the year. While defendants have not by their testimony given us definite figures as to the amount of money attributable to this branch of the business for working capital, we think it may be fixed definitely from this record. After the Browns had acquired the store, they organized a corporation to which the retail store was transferred, and $4,000 was put in by them for working capital; it has been a money-maker ever since. We think this sufficient to fix the sum of $4,000 as the amount required for working capital.

It does not require the citation of authorities to demonstrate that this transaction, by which the Browns, purporting to represent the company, sold to themselves individually this valuable property, calls for the most careful scrutiny.   Innocent stockholders have since become interested in the retail store property, and equitable considerations do not require us to attempt an unscrambling of the situation by decreeing a return of the property and an accounting covering five years' operation.   The ends of equity will be served by requiring the defendants Brown to pay the fair value of the property at the time they took it over.   It will be doing them no injustice to fix the value of the retail store at the value fixed by Herschel in his letter to his father.   He was more familiar with it and its value than his father was, and if we capitalize its earnings as a basis of value, it would exceed this amount.   This amount, of course, would include necessary cash for working capital, which we have fixed at $4,000.   The Browns did not receive this working capital from the company, and the fair value of the retail business at the time they took it over without such working capital is, therefore, fixed at $15,000.   They will account for the difference between this value and the amount paid.

4 and 5.   We shall treat the surrender of the insurance policies and the increase of the salaries together. Both occurred at the same meeting.   Alfred J. Brown testifies the insurance policies were canceled because the company could not afford to carry them, and that the salaries were increased because they were earned. When the preferred stock was issued insurance on the lives of the two Browns was taken out in the sum of $200,000.   The company was made the beneficiary and paid the premiums.   We are not persuaded that it was good business to take out this insurance nor that it was bad business to surrender it when it was

given up. A ruling of the treasury department as to taxes collectible by the government if loss occurred had materially minimized their value, and the insurance was not worth what the company was paying for it. The cash surrender value of it was paid by the Browns to the company, and they took it over. We do not think the company suffered by this transaction, but on the contrary it profited by it. But on the same day, by the votes of Alfred J. and Herschel, their salaries were increased, that of Alfred J. to $15,000 a year, and that of Herschel to $12,000 a year. This was more than they had ever received before or have since. Later Alfred J. Brown served as president at $4,800 a year, and Herschel's services were dispensed with entirely. This increase of salaries went far towards paying the premiums on the policies that day taken over by them, and we are not persuaded that their services were worth the sum fixed by themselves. They should account for the money received as increased salaries. See *McKey* v. *Swenson*, 232 Mich. 505.

6. On July 1, 1916, Herschel gave his note to the company for $8,000. It is said that this was given to pay for his stock. It is somewhat difficult to follow this suggestion. The company at that time had no treasury stock to issue, and the record discloses that as Herschel's holdings increased those of his father correspondingly decreased. But be that as it may, the note was given, as stated, it was part of the assets of the company, and he held stock in the company upon which he had drawn $7,128 in cash dividends, no part of which, however, was applied on his debt nor had any of his salary been so applied. On November 30, 1920, his note was canceled upon the surrender of stock of the company in this amount. He also owed the company $4,307 on overdrafts. On July 15, 1921, he was given the check of the company for

$4,500 upon surrender of stock for this amount. The check was used to pay his overdraft. At this time the company was not sailing on any too tranquil seas. In discussing another branch of the case, defendants' counsel thus tersely describe the situation:

"The greatly increased level of seed prices continued until the latter part of November, 1920, when a sharp slump in the price of peas and beans followed in the wake of similar slumps in other commodities, which had occurred in the early autumn of 1920. This slump in prices necessitated the writing off of between $150,000 and $200,000 of the value of the company's peas and beans in its inventory of December 31, 1920."

No one was better prepared to foresee the conditions liable to arise in the seed business than were defendants. No one could read the handwriting on the wall better than they. Alfred J. Brown had been in the business around 35 years. Herschel had been in the business all his life. It is quite true that this record discloses a slump in the seed business beginning in the fall of 1920. It was sharp and persistent. It cut the value of the common stock and foretold a cession of dividends. On the 30th day of November of this year, Herschel turned over stock which was daily growing less valuable and his note was given up and canceled. On December 31, 1920, there was a deficit of $70,447.08, at the end of the next year it was $159,475.55, and at the end of the succeeding year it had reached $302,076.28. In July, 1921, he surrendered more of the stock of the company to pay his overdraft. He had received thousands of dollars as dividends and added thousands of dollars for salary but made no attempt to pay or reduce his indebtedness, nor was any attempt made by the directors of the company to compel payment. The company had a lien on all his stock for this indebtedness (2 Comp. Laws 1915, § 9032). We need not discuss when and under what circumstances a cor-

poration may retire its corporate stock. This transaction does not bear the earmarks of good faith. The defendant T. Herschel Brown will be decreed to pay this indebtedness to the company.

7. It is further insisted on behalf of defendants that plaintiff has been guilty of laches and is estopped from now asserting its claim. Nothing is claimed for the statute of limitations. We have pointed out that until the spring of 1923 the two Browns and their bookkeeper made up the board of directors. In March of that year a new board was chosen but did not function until the banks were paid off the following fall. Gradually the transactions here involved came to light. Counsel for defendants invoke the rule in cases involving rescission for fraud that one must proceed promptly on discovering the fraud. But counsel do not differentiate between actions for or based on rescission and actions for fraud directly. One who seeks to rescind a contract for fraud must act promptly upon discovering the fraud, and place the other party *in statu quo*. But one suing for fraud, or seeking an accounting for fraudulent transactions without rescission may do so within the period fixed by the statute of limitations, which here is not pleaded or insisted upon.

Alfred J. Brown entered into an agreement with one Charles E. Norton, representing the board, whereby he agreed to place his common stock in the hands of the Grand Rapids Trust Company as trustee to vote with the preferred stock, that stock having become entitled to vote by reason of default in payment of dividends on it. Mr. Brown did not carry out this agreement, and Norton filed a bill solely for specific performance of this agreement. A consent decree granting such relief was entered on stipulation of counsel that recited that the parties "had adjusted their differences." Mr. Brown and his attorney

testify that they understood that they were settling everything, but all agree that none of the matters here involved were ever discussed by any of the parties. Counsel for plaintiff calls attention to the fact that Alfred J. Brown owned a majority of the stock outstanding, and could therefore control the action of the company at any stockholders' meeting, and that as a precautionary measure it was proper to have the stock in the hands of the trust company before launching this suit. The pleadings in that case in no way referred to any of the transactions here involved; the differences there involved, and the only differences there involved, grew out of the refusal of Brown to place the stock in the hands of the trust company, and by the consent decree Mr. Brown was only required to live up to his contract. We are not persuaded that plaintiff is guilty of laches precluding recovery, or that it is estopped from asserting the claims here involved.

The decree appealed from will be reversed, and one here entered in accordance with this opinion. Plaintiff will recover costs of both courts against Alfred J. Brown and T. Herschel Brown.

SHARPE, C. J., and BIRD, WIEST, CLARK, and McDONALD, JJ., concurred.

The late Justice SNOW and Justice STEERE took no part in this decision.