**In re C. A. TAYLOR LOG & LUMBER CO.**

**No. 4530.**

District Court, W. D. Washington, S. D.
May 22, 1925.

See, also, 28 F.(2d) 526.

Harmon & Keyes, of Tacoma, Wash., for trustee in bankruptcy.

Platt, Platt, Fales & Smith, of Portland, Or., for claimant Lumbermen's Warehouse & Storage Co.

Hayden, Langhorne & Metzger, of Tacoma, Wash., for claimant National Bank of Tacoma.

CUSHMAN, District Judge.

This matter is before the court upon petitions of the Lumbermen's Warehouse & Storage Company, and the National Bank of Tacoma, for a review of the action of the referee in holding invalid liens asserted by petitioners upon certain lumber which has been sold by the trustee. A part of the money realized from the sale is held, under stipulation, pending the determination of the petitioners' rights to priority of payment because of their asserted liens.

At the time the trustee took possession of the bankrupt's property it was asserted, both by the bank and the storage company that the latter was in possession of certain of the lumber in the yard of the bankrupt. The storage company asserted a claim for storage charges, and the bank a right in the property by reason of storage receipts held by it as security for money loaned. The trustee claimed to be in possession of this lumber, and disputed the claim of priority of both the bank and the storage company. The trustee petitioned for an order to sell all of the lumber in the yard; an order was issued directing the bank and the storage

company to show cause why the trustee's petition should not be granted. Both answered, asserting the possession of the storage company and their rights to priority. As part of its relief, the bank prayed the foreclosure of its storage receipts. The answer of the storage company, while setting out its asserted claim, merely prayed that the trustee's petition be denied.

Thereafter it was stipulated, by the trustee, the bank, the storage company, and other claimants, that all of the lumber in bankrupt's yard, including that asserted to be stored with the storage company, be sold by the trustee, the proceeds of the sale to be kept separate and intact by the trustee to abide the determination of the several claims asserted against the lumber. "* * * And in this connection it is further stipulated and agreed that the sum of $9,000.00 out of the proceeds of the sale of said lumber shall be kept separate and, as between the Trustee in Bankruptcy, the Lumbermens Warehouse & Storage Company, and The National Bank of Tacoma, said sum shall be treated for all purposes as the proceeds of the sale of the lumber described in the aforesaid warehouse receipts, and no part of said fund shall be disbursed until the final determination of the claims of the Lumbermens Warehouse & Storage Co. and The National Bank of Tacoma."

By the last step taken, any doubt as to the jurisdiction of the bankruptcy court, arising out of the fact of disputed possession, was removed. Bardes v. Hawarden Bank, 178 U. S. 524, 20 S. Ct. 1000, 44 L. Ed. 1175; First Nat'l Bank of Chicago v. Chicago Title & Trust Co., 198 U. S. 280, 25 S. Ct. 693, 49 L. Ed. 1051; Frank v. Vollkommer, 205 U. S. 521, 27 S. Ct. 596, 51 L. Ed. 911; T. E. Wells & Co. v. Sharp (C. C. A.) 208 F. 393; Collier on Bankruptcy (13th Ed.) 744 to 764. As there had been at the time of stipulation no overruling by the referee of any challenge to his jurisdiction, neither the storage company nor the bank were constrained in any way to make the stipulation, as in the case of First National Bank of Chicago v. Chicago Title & Trust Co., 198 U. S. 280, 25 S. Ct. 693, 49 L. Ed. 1051, supra.

The referee, in his certificate, makes a full statement of the evidence and it is not necessary to restate it at any great length. It appears that the bankrupt had been refused further credit by the bank. A Mr. Palmer was the vice president and general manager of the storage company. Mr. Taylor was the president of the bankrupt. Mr. Taylor testifies:

"Q. Well, now, what did Mr. Palmer say he could do, insofar as arranging for a loan, or enabling you to borrow money on these proposed warehouse receipts was concerned, or if he said anything in that connection? A. After looking the plant over he told me that he thought he could arrange a loan for us through a local bank here, The Tacoma National Bank, and after making his inventory there, why, he came in and took the matter up with the Tacoma National Bank, and advised us that we could borrow a certain amount of money on this lumber, and he went ahead then and issued his warehouse receipts, and we took, or I took, them down to the bank, and secured a loan on those receipts."

The storage company leased, at a nominal rental, the lumber yard of the bankrupt at its mill property. The lease was filed in the office of the auditor of Lewis county, which is the county in which the mill and yard are located. The piles of warehoused lumber were, by Mr. Palmer, inventoried, and insured; they were plainly stenciled, first with crayon and later with paint, stating the amount of lumber in each pile. A yard sign was placed at the entrance to the property; this sign was plainly printed in black letters on white muslin, and was about six by ten inches in size, and read:

"Storage Yard
"of
"Lumbermens Warehouse & Storage Co.
"(Home office, Portland, Oregon.)
"Lot No.—

"Do Not Remove."

Placards or signs were also placed upon the front of the separate piles, sections of piles, and parcels of lumber warehoused; these signs were of the same general character as the yard sign, and read as follows:

"This Lumber
"Warehoused and Stored
"with
"Lumbermens Warehouse & Storage Co.
"(Home office, Portland, Oregon.)
"Lot No. —                    Pile No. —
"Do not Remove."

The piles were from a few feet to as high as sixteen feet, and were from six to twenty feet in width—one pile was thirty feet wide. These signs were maintained in position. The evidence shows that when accidentally

torn off they were replaced by bankrupt's mill superintendent.

The lease provides: "To have and to hold said premises, with the appurtenances thereunto belonging unto the said lessee; together with the right, in the lessee or the owner and holder of the warehouse receipt or receipts issued by the said lessee for and covering any of the property stored thereon, by their agents, servants or employees, of free ingress and egress to and from the same, through or over any other premises of the lessee; and the right in the said lessee to place and maintain such signs or marks thereon, or on the property stored thereon, as may be, in the judgment of the lessee, necessary or convenient to indicate the proprietorship and possession of said lessee; and the paramount right in the said lessee, or the owner and holder of its said receipt or receipts, to employ any facilities of the said lessee for receiving, handling, storing, shipping, or delivering said property,

"It is further agreed:

"(1) That the lessee shall not, without the consent of the lessor, for all or any part of the term hereby granted, sublet the said premises or occupy or use the same in any other manner than for storage purposes and for the transaction of such business as may be connected therewith or incident thereto;

"(2) Should the lessor in any manner interfere with or make difficult the duties of the agents, servants or employees of the lessee in connection with the storage of said property, or should the premises hereby leased become involved in any manner of litigation or in insolvency or bankruptcy proceedings, or should the lessee be ejected or ousted therefrom, or proceedings be taken for that purpose, or should the lessee at any time deem it necessary, for the protection of the property stored, then the lessee shall have the right to remove all property from the premises hereinbefore described to such other place or places as the lessee may deem proper and expedient, and in case of any such removal the lessor undertakes and agrees to pay to the lessee all expenses of such removal and of storing said property elsewhere until the property so stored shall be released upon surrender of the warehouse receipt or receipts issued thereon and payment of all advances and charges made upon the same:"

It is evident from this lease that it was not contemplated that the storage company would exclude the bankrupt from the yard;

and the possession of the yard by the bankrupt was not exclusive. The piles of placarded, warehoused lumber were interspersed with the piles of lumber belonging to the bankrupt, not warehoused, and at times the bankrupt's employees placed its lumber not warehoused on top of piles of warehoused lumber. The placing of bankrupt's lumber upon the placarded piles, instead of giving to it a semblance of ownership by the bankrupt would, to the contrary, take from, rather than add to, the apparent assets of the bankrupt; but its effect would be to misrepresent the true condition which might, under certain circumstances, prejudice the bankrupt's creditors. Mr. Palmer explains this as having been sanctioned as looking to the future warehousing of the new lumber so piled.

No employee of the storage company was kept upon the premises. Mr. Palmer, the general manager, visited the yard about once a month. After the organization of the storage company, there was an employee whose business it was to assist in effecting the release of lumber and to make trips to the plant for the purpose of determining whether the lumber was still in the possession of the storage company. His employment lasted two months. Mr. Palmer is of the opinion that this employee never visited the yard. It is not shown how often the employee who succeeded this man, visited the yard. The testimony is not clear that any employee of the storage company, at any time, visited the premises oftener than once a week. The adjudication of bankruptcy took place August 2, 1924; one employee from June 1st to October 4, 1924, designating himself as caretaker, testified that he lived two miles from the premises and that he visited the yard every two or three days to see that nothing was removed without being released. The mill superintendent testifies:

"Q. When you went to ship out any warehoused lumber, as I understood, you were to pay for lumber as it was shipped out, at the agreed price per thousand feet, whatever it was stored at, and the storage. A. Yes. When I removed the pile I took the tags off, and took them to the office.

"Q. Did you have the right, Mr. Beck, to go and take any of that warehoused lumber at any time you saw fit and ship it out?

"Mr. Fales: I object to that question on this ground—that the witness has testified in his earlier examination that he didn't know anything about the arrangement between his company and the Storage Company.

"Mr. Keys: I will change that question.

"Q. Did you when you needed to or had to, or in the conduct of the business, go and take the warehoused lumber and ship it out? A. I did.

"Q. Mr. Beck, in loading the lumber unwarehoused, loading a car of lumber unwarehoused, did you ever go and take a portion of the warehoused lumber to complete the car? A. Yes, sir.

"Q. Did you get permission to do that? A. No.

"Q. And what did you do to take care of this so-called warehoused lumber when you took it to fill up a car, as you say you did? A. I turned the amount in to the office.

"Q. Did you ever build up the pile, or supply the deficiency in the pile when you had sawed similar lumber at the mill? A. Yes, sir.

"Q. So, as a matter of fact, Mr. Beck, you could do just what you pleased, so far as the shipping of that lumber was concerned? A. At any time I needed any amount of lumber to complete a carload I took it, regardless of where it was, or what it was."

Mr. Palmer, general manager of the storage company, testified that upon one occasion he learned of the unauthorized removal by the bankrupt of warehoused lumber, and denies knowledge of such action except upon that one occasion. Payment was made for the lumber so removed.

Mr. Taylor was the mill superintendent of the bankrupt during the time in question. Mr. Palmer, in response to the following question: "Q. Now Major, let me ask you this question: Outside of the fact that you considered Mr. Taylor honest, and you had a contract with him, was there anything to prevent Mr. Taylor or any of his representatives from shipping out any of this lumber at any time?" Answered: "A. Well, I can't say that there was."

The lease was made on the 31st of December, 1923. On the same day the storage receipts, now held by the bank, were issued, and thereafter indorsed in blank and delivered to the bank to secure the payment of money borrowed. The storage receipts are, by their terms, negotiable. There is no testimony that the bank had any knowledge or notice that the storage company did not retain exclusive possession of the warehoused lumber. The storage receipts described the place of storage as follows: "The following described lumber products piled in our (Lumbermens Warehouse & Storage Company's) yard at the plant of C. A. Taylor Log & Lumber Company (Bankrupt)." (The foregoing parentheses are those of the court.)

This recital in the receipts was not an admission by the storage company of possession by the bankrupt of the stored and receipted lumber. The evidence shows the agreement to have been that the bank and the storage company should release any parcels of lumber before the same should be removed by the bankrupt; but the evidence of the mill superintendent shows that, in practice, this was not observed. There is no evidence that the bank had knowledge or notice of this fact.

■■ In view of the recording of the lease and the placarding of the yard, the stenciling and placarding of the piles of lumber, it cannot be truthfully said that the storage company by not maintaining a caretaker or custodian upon the premises clothed the bankrupt with ostensible ownership of this lumber. But, the statute provides that the warehouseman loses his lien upon goods by surrendering possession thereof. Section 3615, Remington's Comp. Stat. While the storage company in the beginning took possession of the lumber in the placarded piles, they thereafter so far surrendered their possession to the bankrupt as to extinguish their lien. From this it does not follow that the lien of the bank, to the amount for which it holds the storage receipts as security, was also lost; for the storage receipts carried title to the warehoused lumber which was substantially in the exclusive possession of the storage company at the time the storage receipts were issued. Section 3627, Remington's Comp. Stat. The storage receipts being negotiable in form, duly indorsed and delivered, for value, to the bank, without notice of any fact impeaching the title evidenced by them, vested the bank with a lien prior to any right of the trustee to such of the lumber in the original placarded piles as can, by a fair preponderance of the evidence, be identified. Union Trust Co. and Security Warehousing Co. v. Wilson, 198 U. S. 530, 25 S. Ct. 766, 49 L. Ed. 1154; Hurley, Trustee, etc., v. Atchison, Topeka & Santa Fé Ry. Co., 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729; Sexton, Trustee in Bankruptcy of Kessler & Co., v. Kessler & Co., Ltd., 225 U. S. 90, 32 S. Ct. 657, 56 L. Ed. 995; Pacific State Bank v. Coats (C. C. A.) 205 F. 618–624, Ann. Cas. 1913E, 846; In re Flatland et ux. (Jennings v. Mann) 196

F. 310 (C. C. A.); In re Lane Lumber Co., Ltd. (Boyd v. Wall), 217 F. 550 (C. C. A.); First Nat. Bank of New Kensington v. Pennsylvania Trust Co. (C. C. A.) 124 F. 968; Philadelphia Warehouse Co. v. Winchester et al. (C. C.) 156 F. 600; In re Cincinnati Iron Store Co. (Beiser v. Western German Bank) 167 F. 486 (C. C. A.); see also, Standard Bank of Canada v. Lowman et al. (D. C.) 1 F.(2d) 935 (Western District of Washington).

The cases relied upon by the trustee, in rejecting the bank's claim, are distinguishable from the foregoing. Citizens' Bank v. Willing, 109 Wash. 464, 186 P. 1072, was a case where the warehouse receipt was held not negotiable because the warehouseman was not engaged in the business of storing goods for profit, but was in reality storing its own goods, issuing warehouse receipts therefor. In the present case the storage company was, without question, engaged in the storing of goods for profit. Hastings v. Lincoln Trust Co., 115 Wash. 492, 197 P. 627, 18 A. L. R. 583, was a case where it was held that the warehouse receipt had not been negotiated, because under its terms and under the statute, a warehouse receipt could only be transferred by indorsement, and the warehouse receipt had not been indorsed. In the present case the storage receipts were duly indorsed. Security Warehousing Co. et al. v. Hand et al. (C. C. A.) 143 F. 32, was a case where warehouse receipts were held not negotiable because the statute provided that negotiable warehouse receipts could be issued only when the goods were stored in a public warehouse, openly held out as such, on *equal terms* to all persons. (Italics are those of this court.) Security Warehousing Co. v. Hand, 206 U. S. 415–420, 27 S. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789.

The statute of Washington, section 3644, Remington's Comp. Stat., defines a warehouseman as a person lawfully engaged in the business of storing goods for profit. In Laube v. Seattle National Bank, 130 Wash. 550, 228 P. 594, the court adopts the rule announced in Union Trust Company and Security Warehousing Company v. Wilson, 198 U. S. 530, 25 S. Ct. 766, 49 L. Ed. 1154, and Love v. Export Storage Company et al. (C. C. A.) 143 F. 1, and distinguishes its ruling in Citizens' Bank v. Willing, 109 Wash. 464, 186 P. 1072, and Hastings v. Lincoln Trust Co., 115 Wash. 492, 197 P. 627, 18 A. L. R. 583.

The referee's order denying priority to the claim of the Lumbermen's Warehouse & Storage Company is affirmed. The referee's order denying priority to the claim of the National Bank of Tacoma is disapproved, for the reasons stated; and the cause is again referred to the referee for the determination of the question of whether sufficient of the lumber sold by the trustee was identical with that in the original placarded piles, at the time of the issuance of the storage receipts, to pay in full the claim of the bank. If that fact is established, such claim to be paid in full.