## EQUITABLE TRUST CO. et al. v. A. C. WHITE LUMBER CO.
### No. 1106.

District Court, D. Idaho, N. D.
May 3, 1930.

A. B. Ridgway, of Portland, Or., and E. W. Wheelan and Allen P. Asher, both of Sandpoint, Idaho, for objectors.

I. N. Smith, of Portland, Or., for petitioner Western Lumber Warehousing Co.

W. C. Bristol, of Portland, Or., for petitioner Federal Securities Co.

CAVANAH, District Judge.

The Equitable Trust Company, an Oregon corporation, and Earl C. Bronaugh, as trustee, on October 30, 1929, instituted this suit to foreclose a mortgage upon all of the property of the defendant A. C. White Lumber Company, an Idaho corporation, and on November 2, 1929, Lauritz S. Franck was appointed receiver. Thereafter, on December 9, 1929, upon petition of certain resident and foreign creditors having claims against the lumber company, and after the lumber company admitted their validity and consented to the appointment of a general receiver, the powers of the receiver were enlarged to a general receiver. Upon a report of the receiver, made on November 2, 1929, attention was called to the existence of certain warehouse certificates, executed by the Western Lumber Warehousing Company, covering lumber stored in the yard of the lumber company at Dover, Idaho, securing a balance due on indebtedness evidenced by promissory notes of the lumber company, and authority was then requested and granted to permit the receiver to issue receiver's certificates to pay the prior incumbrances against the lumber. There appeared then to be approximately $34,000 in notes of the lumber company outstanding, secured by warehouse receipts, and of which more than one-half were paid by the receiver out of funds received from the receiver's certificates, leaving a balance unpaid of $14,966.62.

Some time in January, 1930, counsel for the lumber company protested to the receiver making any further payments on the balance of the indebtedness secured by the warehouse certificates, on the ground that the transactions out of which the indebtedness evidenced by the notes arose are usurious, and the warehouse receipts hypothecated by the lumber company to secure the payment of the loans are invalid. After such protest, the receiver applied for an order of the court, which was granted on January 25, 1930, directing him to deposit in the clerk's office the balance of $14,966.62 and interest, pending the determination of the protest, and directing all creditors and parties claiming any interest therein to appear in court on February 10, 1930, and show cause why said sum so deposited should not be paid to the warehousing company.

At the hearing on the order to show cause, the warehousing company and the Federal Securities Company filed their petitions, praying for an order requiring the clerk of the court to pay to them the said balance of $14,966.62, on the ground that the court did not have jurisdiction to appoint the general receiver, and that the warehouse receipts covering the fund involved are valid, and the holders thereof have a preferred lien upon the fund now in the custody of the clerk. Considerable testimony was taken, in which it appears that, after negotiations between the warehousing company and the defendant lumber company, a plan of financing the lumber operations of the lumber company was developed, in which the warehousing company was granted permission to occupy a portion of the lumber yard of the lumber company for the purpose of storage of finished lumber, owned by the lumber company. No compensation was paid as rental by the warehousing company. The lumber company agreed to pay to the warehousing company for the lumber piled in its yard 15 cents per thousand feet per month for the first million feet of lumber so piled, and 7½ cents per thousand feet per month on any stock of lumber in storage over one million feet, said compensation to be computed not only on lumber actually covered by warehouse receipts, but also all lumber piled in the yard. In addition to these charges, the lumber company paid to the warehousing company 6 per cent. per annum on the principal of each of the seven loans made, and one-half of 1 per cent. of the loans every ninety days, and in addition thereto paid a monthly salary of $200 during a portion of said period, and thereafter a monthly salary of $150, for a

man kept at the yard, all of which payments aggregated $10,638.16 during the period in which the loans were made. There was a further sum paid by the lumber company of $438.75 as premium on a policy of life insurance issued on the life of E. R. McCory, president and treasurer of the lumber company, in favor of the securities company as additional security for loans made by it. Based upon these facts, the receiver and intervening creditors contend that the loans and the entire transaction is tainted with usury, and that the warehouse receipts are invalid and insufficient to create a lien entitling the holder thereof to any rights as lien claimants on the lumber therein described in preference to unsecured creditors, in that the lenders of the funds receive as interest thereon a sum in excess of 10 per cent. per annum allowed under section 2552 of the Idaho Compiled Statutes.

Before considering the question as to the validity of the warehouse receipts, it becomes necessary to first ascertain whether or not the court has jurisdiction to determine the issue concerning the validity of the receipts, for both the securities company and the warehousing company challenge the jurisdiction of the court, upon the ground that the order of the court of December 9, 1929, appointing Franck a general receiver, is invalid, because the appointment was made on petitions of simple contract creditors who had not reduced their claims to judgment, and therefore neither he nor intervening creditors have any right to appear and contest the title of the securities company or the warehousing company in the fund deposited. It will be observed from the record that petitions were filed by resident and nonresident creditors of the defendant, requesting the appointment of the general receiver, and the defendant lumber company not only admitted the validity of the mortgage indebtedness, but consented to the appointment of the receiver originally upon the bill to foreclose the mortgage, and also on December 6, 1929, to the appointment of the general receiver, and thereafter, when the order for the appointment of the general receiver was made, it again consented in writing to the entering of the same.

■■ The general rule that a receiver cannot be appointed on a bill filed by an unsecured creditor who has not reduced his claim to judgment is inapplicable where the debtor answers and expressly consents to the appointment of the receiver, admits the indebtedness and its insolvency, and fails to object

seasonably, and the objection by others under such circumstances to the jurisdiction of the court will be treated as waived. This principle applies with equal force to a creditor of a defendant corporation when brought in, for, if not, a most absurd result would ensue if, when a debtor corporation has submitted itself to the jurisdiction of the court, a creditor could come in, or, when brought in, might reopen the matter of jurisdiction over the debtor corporation. Here we have the securities company and the warehousing company, without objection, permitting the general receiver to go into possession of all of the property of the defendant, transact large business, dispose of the assets of the corporation, assume obligations, and pay to them more than one-half of their claims without intimation of lack of authority or any objection to the proceedings. Acting as such, they cannot now be heard to say that they did not have knowledge of the appointment of a general receiver, because the record shows that they did, as they had dealings with him for some time in regard to their claims and accepted payments thereon made by him until the protest was made to the receiver to discontinue doing so. Under such circumstances, and without the necessity of invoking the principle thus stated, good faith, fair dealings, and an early assertion of their objection, being essential upon their part, would now preclude them from objecting to a continuation of the receiver. The principle here announced is supported generally by the federal courts, and as logically stated by the court in the case of Horn v. Pere Marquette R. Co. (C. C.) 151 F. 626, 633:

"Next it is said that the bill under which the receiver was appointed was filed by a single unsecured creditor, who had no judgment, and who claimed no lien. But the defendant debtor appeared, and, by a sworn answer, confessed the debt and its utter insolvency, and joined in the prayer for the appointment of a receiver. The objection, if tenable in view of the confession of the debt and of insolvency, was one which, in a case where the court had jurisdiction of the parties and is of general equitable cognizance, may be waived 'and, when waived, stands as though no such objection ever existed.' Tompkins [Co.] v. Catawba Mills (C. C.) 82 F. 780; Sage v. Memphis, etc., Ry. Co., 125 U. S. 361, 8 S. Ct. 887, 31 L. Ed. 694; Mellen v. Moline, etc., Iron Works, 131 U. S. 352, 9 S. Ct. 781, 33 L. Ed. 178; Hollins v. Brierfield Coal, etc., Co., 150 U. S. 371, 380, 14 S. Ct. 127, 37 L. Ed. 1113. In the case last cited, the court expressly held that such

an objection must be made in limine or it is waived, citing Reynes v. Dumont, 130 U. S. 354, 9 S. Ct. 486, 32 L. Ed. 934, and other cases. * * * A most absurd result would ensue if, when the corporation has submitted to the jurisdiction of the court * * * a creditor could come in, or when brought in, might reopen the matter of jurisdiction over the debtor corporation. If such an objection is not waived once for all, so as to close the question as to stockholders and creditors, what number of creditors would conclude the rest? In Grand Trunk Ry. Co. v. Central Vermont Ry. Co. (C. C.) 85 F. 87, it was very logically ruled by Judge Wheeler that a mortgagee subsequently intervening and being made a defendant could not demur to the bill because the complainant who filed the bill was not a judgment creditor, being bound by the waiver of that objection by the railroad company which had answered, and consented to the appointment of a receiver."

See, also, Brown B. & Co. v. Lake Superior Iron Co., 134 U. S. 530, 10 S. Ct. 604, 33 L. Ed. 1021; The Central Trust Co. of N. Y. v. McGeorge, 151 U. S. 129, 14 S. Ct. 286, 38 L. Ed. 98; Citizens' Bank & Trust Co. v. Union Mining & Gold Co. (C. C.) 106 F. 97; Kessler v. William Necker (D. C.) 258 F. 654; McAtamney v. Commonwealth Hotel Const. Corp. (D. C.) 296 F. 500; Cincinnati Equipment Co. v. Degnan (C. C. A.) 184 F. 834; Walker v. United States Light & Heating Co. (D. C.) 220 F. 393; Beet Growers' Sugar Co. v. Columbia Trust Co. (C. C. A. 9) 3 F.(2d) 755.

■■ It will be remembered that the mortgage which is being foreclosed here covers all of the property of the defendant corporation, admittedly insolvent, and, after such admission and the consent to the appointment of a general receiver by it, the court was required to regard the suit as one against an insolvent corporation, wherein a general receiver was sought to conserve all of the assets, whether included in the mortgage or not, because the administration of the assets of the insolvent corporation is within the functions of a court of equity, and, the parties being before it, the court had power to proceed and administer the property of the insolvent corporation. Hoover v. Mortgage Co. for America, 290 F. 891 (C. C. A. 9). So where, as here, the receiver having been appointed on consent of the debtor defendant, and under orders of the court has entered upon the administration of the property of the defendant, incurring obligations, and making large expenditures, it is too late, even if objectors could do so, to urge that the court had no jurisdiction to appoint the general receiver. Yaryan Naval Stores Co. v. B. Borchardt Co. et al. (C. C. A.) 217 F. 758.

■■ The mere fact of the lumber company having first submitted itself to the original jurisdiction in equity to foreclose the mortgage does not thereafter deprive it of the right of consenting to the appointment of a general receiver, for the general receivership recognizes the power of the court to foreclose the mortgage, and in no way conflicts with, or takes away, any of the court's power. The mortgage is foreclosed just the same under the general receivership as before, and such position does not run counter to equity rule No. 37 (28 USCA § 723) or the cases of King v. Barr (C. C. A.) 262 F. 56, or Pusey & Jones v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 457, 67 L. Ed. 763, relied upon by the securities company and the warehousing company. Jurisdiction of the court is not lost because the securities company and the warehousing company have come in and asserted rights to the property of the defendant, because their presence is not essential to a decision of the controversy between the original parties to the suit (Wichita Railroad & Light Co. v. Public Utilities Commission, 260 U. S. 48, 54, 43 S. Ct. 51, 67 L. Ed. 124), and therefore they cannot challenge the court's jurisdiction. King v. Barr, supra. All that the court held in the case of King v. Barr, supra, was that an intervener coming in six months after the entry of a final decree, and after all of the property in question had been disposed of under the decree, cannot challenge the jurisdiction of the court. Nor are the facts in the case of Pusey & Jones v. Hanssen, supra, similar to those in the present case, as we find that the bill upon which the receiver was appointed in that case was prosecuted by Hanssen, who was an unsecured simple contract creditor, and who did not consent to the appointment of the receiver, as was done here by the debtor corporation. The case is clearly distinguishable from the case we are considering, and may be considered as sustaining the jurisdiction of the court, as it is there said:

"The case at bar is also unlike In re Metropolitan Railway Receivership, 208 U. S. 90, 109, 110, 28 S. Ct. 219, 52 L. Ed. 403, and many others, in which there was express consent by the corporation to the appointment of the receiver, or where the indebtedness to plaintiff and the corporation's insolvency were admitted, or the lack of jurisdiction in equity was waived. The objection that the bill does not make a case properly cognizable in a court of equity does not go to its ju-

risdiction as a federal court. Smith v. McKay, 161 U. S. 355, 16 S. Ct. 490, 40 L. Ed. 731; Blythe v. Hinckley, 173 U. S. 501, 19 S. Ct. 497, 43 L. Ed. 783. The objection may, as pointed out in Reynes v. Dumont, 130 U. S. 354, 395, 9 S. Ct. 486, 32 L. Ed. 934, be taken by the court of its own motion. But, unlike lack of jurisdiction as a federal court, Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan, 111 U. S. 379, 382, 4 S. Ct. 510, 28 L. Ed. 462, lack of equity jurisdiction (if not objected to by a defendant) may be ignored by the court, in cases where the subject-matter of the suit is of a class of which a court of equity has jurisdiction. And where the defendant has expressly consented to action by the court, or has failed to object seasonably, the objection will be treated as waived. Brown v. Lake Superior Iron Co., 134 U. S. 530, 535, 536, 10 S. Ct. 604, 33 L. Ed. 1021; Southern Pacific R. R. Co. v. United States (No. 1), 200 U. S. 341, 349, 26 S. Ct. 296, 50 L. Ed. 507. In cases relied upon by respondent there was such waiver. But, here, the company strenuously insisted throughout upon the absence of jurisdiction and denied every material allegation on which it is sought to support the bill."

The principal contention of the receiver that the loans made by the different finance concerns to the lumber company and the warehouse receipts issued to secure the same were usurious and invalid requires a consideration of the facts relating to the transactions out of which the loans were made. The lumber company, desiring financial assistance, at different times made arrangements with the warehousing company to secure for it loans on lumber stock held in the yard of the lumber company, and a system known as a "field warehousing system" was worked out. The warehousing company was licensed to use and occupy the lumber yard of the lumber company at Dover, where the lumber was stacked in separate piles and numbered and tagged, and a sign was placed on each pile, where the lumber was piled, and on which was plainly printed in black letters words sufficient to inform the public that the lumber was held by the warehousing company. The lease entered into between the lumber company and the warehousing company provides that the warehousing company had the right to possess and use the part of the yard where the lumber was so piled, and it is clear from it that it was not the intention of the warehousing company to exclude the lumber company from the yard, and the possession of the yard by the lumber company was not exclusive. An employee was at the yard looking after the lumber so tagged, and assisted in the releasing of it. After the arrangements, the warehouse receipts were issued and indorsed by the lumber company and delivered to those who made the loans to secure their payment. The lumber was easily identified, and a description of the place of storage was clear. There would be no difficulty on the part of an attaching creditor or intending purchaser to identify the actual lumber covered by the warehouse receipts, for notice was posted upon each pile. The intention of the owners is made clear by thus identifying and segregating the piles of lumber, which was for the purpose of giving control over it. Ward v. First National Bank (C. C. A. 6) 202 F. 613; Boise v. Talcott (C. C. A.) 264 F. 61; Atherton v. Beaman (C. C. A.) 264 F. 878, 881. It was understood that, when the lumber was sold, the money derived therefrom was to be used in taking up the warehouse receipts, which was done. The lumber company, securities company, warehousing company, and plaintiff all had knowledge of the manner in which the lumber covered by the warehouse receipts was handled and disposed of. During the time plaintiff consented to surrender its prior liens and relinquished all claim of prior control and possession to the warehousing company of all claims under its mortgage before the warehousing company issued its receipts to any one from whom the securities company acquired a receipt as bona fide purchasers for value. The situation was known by plaintiff and defendant, and recognized to exist when in applying for an order of the court protecting rights of those who held the receipts. We find a similar case as the present one in the matter of Taylor Log & Lumber Co., Bankrupt, 41 F.(2d) 249, decided by Judge Cushman, where the court upheld the validity of warehouse receipts. In view of the present facts, it cannot fairly be said that, because in the plan adopted the warehousing company was not required to pay any taxes or rent for the use of the yard or expense in handling the lumber, the bona fide purchasers for value of the warehouse receipts lost their lien, and that the transaction was not a valid warehousing of property. In re Pine Tree Lumber Co. (C. C. A.) 269 F. 516, 519.

The plan was one where the warehousing company bona fidely took open and exclusive possession of the stored lumber, and continued doing so with its own keeper in charge, and marked each pile of lumber so

that the public knew how it was being held. Such a plan should not be condemned as not being a valid "field storage warehouse plan."

This takes us to the last objection as to whether the warehouse receipts are negotiable and the transaction usurious. Objectors urge that the receipts are not negotiable and are usurious, for the reason that the charge for the use of the money loaned to the lumber company was for more than is allowed under the statutes of Idaho, where the rate of interest shall not exceed 10 per cent. per annum. As to their negotiability, it is asserted that, while each receipt contained a blank space for such charges, and in some instances they show that the charges were to be 15 cents per thousand for the first million feet and 7½ cents per thousand for the excess, it cannot be ascertained whether the charge on the particular lumber described therein was to be at the higher or the lesser rate, and therefore the failure to insert the rate of storage charge makes them nonnegotiable under section 6120 of the Idaho Uniform Warehouse Receipts Law.

When in determining the effect of the statute requiring the rate for storage charges to be embodied in the receipts, we are confronted with another provision of the Idaho statutes providing that "a receipt in which it is stated that the goods received will be delivered to the bearer, or to the order of any person named in such receipt is a negotiable receipt. No provision shall be inserted in a negotiable receipt that it is nonnegotiable. Such provision, if inserted, shall be void." Idaho C. S. § 6123. It seems clear from this provision of the statute that the only requirements for a negotiable warehouse receipt are that the receipt shall state "that the goods received will be delivered to the bearer, or to the order of any person named in such receipt." We must read section 6120, providing that the receipt must contain "the rate of storage charges," with sections 6123, 6145, and 6148 of the statutes, in order to determine whether the failure to recite any of the terms provided for in section 6120 in a warehouse receipt renders it nonnegotiable.

Section 6148 provides:

"If a negotiable receipt is issued for goods, the warehouseman shall have no lien thereon, except for charges for storage of those goods subsequent to the date of the receipt, unless the receipt expressly enumerates other charges for which a lien is claimed. In such case there shall be a lien for the charges enumerated so far as they are within the terms of section 6145, although the amount of charges so enumerated is not stated in the receipt."

And section 6145, C. S. Idaho, provides:

"Subject to the provisions of section 6148, a warehouseman shall have a lien on goods deposited or on the proceeds thereof in his hands, for all lawful charges for storage and preservation of the goods; also for all lawful claims for money advanced, interest, insurance, transportation, labor, weighing, coopering and other charges and expenses in relation to such goods; also for all reasonable charges and expenses for notice, and advertisements of sale, and for sale of the goods where default has been made in satisfying the warehouseman's lien."

In interpreting these four sections of the statute in pari materia, the deductions are that the only requirements under them which are necessary to make the receipt negotiable are those specified in section 6123, "that the goods received will be delivered to the bearer, or to the order of any person named in such receipt," and therefore the terms specified in section 6120 do not of themselves make the receipt negotiable, unless the receipt contains the provision set forth in section 6123. The only purpose of embodying in the receipt the rate of storage charges, or liabilities incurred by the warehouseman, is to preserve the lien and secure the payment to the warehouseman of such charges. Smith Bros. Co. v. Richheimer & Co., 145 La. 1066, 83 So. 255, 258; Manufacturers' Co. v. Monarch Co., 266 Ill. 584, 107 N. E. 885. So the proper construction of the statute, when applied to the receipts in question, is that the receipts are not rendered invalid or nonnegotiable by the omission of the rate of storage charges, if such appears therein.

The further assertion of objectors that the warehousing plan and the loans made by the different finance concerns to which the warehouse receipts were assigned were usurious, for the reason that it consisted of contracting for and receiving a greater rate of interest on the principal sum than is allowed by section 2552 of the Idaho Compiled Statutes, wherein parties agreeing in writing for the payment of interest on money loaned are limited to 10 per cent. per annum, is not tenable when we consider the facts relating to the loans here made by the securities company, who did not receive as interest a rate exceeding 10 per cent., although there were warehouse charges made by the warehousing company and commissions paid by it to the agent of the lenders.

These warehouse charges were separate and apart from the security company's charges of interest. It loaned its service and credit, which consisted of taking possession of the stored lumber, inspecting, grading, piling, and separating, and issued its negotiable warehouse receipts in favor of the lumber company, and guaranteed the truth of the recitals therein. The lumber company was financially embarrassed, and called the warehousing company in, and adopted a modern business plan to meet the necessities for a quick financial transaction, and agreed to pay it separate and apart from the rate of interest charged for the principal sum for such service and credit. To secure such service and credit, the lumber company had to pay the warehouse charges and commissions. The warehousing company had the right to sell its credit at whatever price it could get for it, and, if the transaction is in good faith, a greater discount may be charged than the prescribed rate of interest without violating the usury laws. A corrupt purpose must exist to loan money at an illegal rate of interest before it will contravene the usury laws. Philadelphia Warehouse Co. v. Seeman (C. C. A.) 7 F.(2d) 999. It will be remembered that the warehousing company took possession of the stored lumber, assumed all responsibility therefor as between it and the lumber company, and issued its negotiable instrument to the owner of the lumber so stored with the knowledge of the lumber company that the instrument be indorsed to innocent third persons, and by so doing the warehousing company loaned its credit to the lumber company. This plan did not contravene the usury laws, and is upheld in the case of Coast Finance Corp. v. Powers Furniture Co., 105 Or. 339, 209 P. 614, 24 A. L. R. 855. The evidence does not show that the lumber company participated in any agreement with the warehousing company, whereby the warehousing company was required to pay a discount rate to the securities company; while the warehousing company when in renewing the lumber company's paper stood a loss, and did so without the consent of or any additional charges to the lumber company. A corrupt intent and knowledge on the part of the lender, securities company, must exist at the inception of the contract before penalties of usury would be enforced. Idaho C. S. § 2554; Olson v. Caufield, 32 Idaho, 308, 182 P. 527; Anderson v. Creamery Co., 8 Idaho, 200, 67 P. 493, 56 L. R. A. 554, 101 Am. St. Rep. 188; Coast Finance Corp. v. Powers Furniture Co., supra. The evidence would not warrant the conclusion that the parties were not acting under an honest belief that the rate of interest was less than the maximum provided for by the statute.

There was ample evidence that the securities company is engaged in the business of loaning money, purchasing and discounting paper for value in the ordinary course of business, and purchased in good faith for value the warehouse receipts negotiated to it, and, after the money was loaned by it, which was secured by the receipts, it was taken and used by the lumber company for its benefit as a going concern. Good conscience and fair dealings under the evidence require a court of equity to recognize and protect its rights in the enforcement of the warehouse receipts lien on the lumber, and therefore the petitions of it and the warehousing company, as bona fide holders of securities, are granted, and an order will be entered requiring the clerk of the court to pay out of the funds deposited with him under order of the court the amount covered by the receipts. As to the prayer of the warehousing company for allowance of attorney's fees and expenses, it is thought that under the record, where the contest was over the application of the fund in the custody of the clerk, the court would not be justified in allowing the same, but petitioners, warehousing company and securities company, are allowed their usual costs.