GUARANTY TRUST CO. OF NEW YORK v. GRAND RAPIDS, G. H. & M. RY. CO.

GRAND RAPIDS TRUST CO. v. UNITED LIGHT & POWER CO.

Nos. 2068, 2090.

District Court, W. D. Michigan, S. D.

Aug. 18, 1931.

In No. 2068:

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and Butterfield, Keeney & Amberg, of Grand Rapids, Mich. (Edwin S. S. Sunderland and L. H. Coleman, both of New York City, of counsel), for complainant.

Carroll, Kirwin & Hollway, of Grand Rapids, Mich., for defendant.

Knappen, Uhl & Bryant, of Grand Rapids, Mich., for receiver.

In No. 2090:

Knappen, Uhl & Bryant, of Grand Rapids, Mich., for complainant.

T. K. Humphrey, of Chicago, Ill., Park Chamberlain, of New York City, and Norris, McPherson, Harrington & Waer, of Grand Rapids, Mich., for defendant.

RAYMOND, District Judge.

On July 28, 1926, the Grand Rapids Trust Company was appointed in this court as receiver of the interurban electric railway known as the Grand Rapids, Grand Haven & Muskegon Railway Company. It was then operating about 46 miles of railroad between the cities of Grand Rapids and Muskegon, including a branch line to Grand Haven. This is an ancillary proceeding brought by the receiver to recover from the United Light & Power Company payments claimed to have been unlawfully made by the railway company to the United Light & Railways Company and its successor, the defendant in this case, for dividends, management fees, contracting fees, engineering fees, excess note interest, and for interest on money deposited monthly by the railway company with the United Light & Railways Company or its successor, the defendant, for bond interest prior to the semiannual due dates of the coupons. Throughout the period of these payments the defendant and its predecessor were the owners of substantially all of the capital stock of the railway company, the relation being that of holding company and subsidiary. The amount claimed for dividends unlawfully paid is approximately $579,000; for management fees, $169,327.71; for contracting and engineering fees, $33,004.20; for excess note interest paid, $29,873.08; and for interest on bond interest deposited before due, $7,342.26. Plaintiff also claims interest on these various sums from the date of each of the alleged illegal payments.

A brief history of the several corporations involved herein is essential. The Grand Rapids, Grand Haven & Muskegon Railway Company was organized under the street railway act of the state of Michigan on March 6, 1899, with an authorized capital stock of $100,000, of which 252 shares of the par value of $100 each were subscribed and a total of $6,250 paid in; in November, 1900, the capital stock was increased to $1,200,000; on May 1, 1901, a mortgage was executed securing an issue of $1,500,000 of bonds; on May 7, 1901, a contract for construction of the railroad was executed by the railway company with Westinghouse, Church, Kerr & Co. pursuant to a proposal of that date whereby the construction company subscribed for $1,100,000 of capital stock of the company. The consideration for the issuance of that stock as fully paid and nonassessable and for the delivery of first mortgage bonds to the amount of $1,250,000 was the construction of the railway system and the furnishing of the necessary machinery and electrical equipment for power houses, rolling stock, etc. The remaining $250,000 of the bond issue was reserved for the cost of a bridge over Grand river at Grand Haven, and the acquisition or construction of additions to the line of railway. A substantial portion of the bonds so reserved was (about 1904) delivered for the use of the construction company, it appearing that agreed additions to the property had been made. Operations began early in 1902, and the company continued under what is referred to as "Westinghouse control" until April, 1912, when the entire issue of common stock was purchased, subject to the outstanding bond issue, by the United Light & Railways Company for approximately $300,000.

About January 1, 1924, the United Light & Power Company, a Maryland corporation, acquired title to and took possession of all of the assets of the United Light & Railways Company, under the control of which operations continued until March 1, 1925, when the United Light & Power Company sold to the United Motor Products Company (a corporation) all of the capital stock of the railway company. During the latter part of 1925 (a few months before the bonds matured) all of the capital stock was transferred to S. L. Vaughn and associates, for a merely nominal consideration. This period of operation from 1912 to 1925 by the United Light & Railway Company and the defendant is referred to as the period of control by the United Company. Late in 1924 the United Light

& Power Company caused to be organized a subsidiary corporation known as the United Light & Power Engineering & Construction Company for the purpose of contracting with its various subsidiaries for engineering and contracting services.

Through its ownership of a majority of the common stock of the railway company, Westinghouse, Church, Kerr & Company dominated and controlled the operations of the company from 1902 to 1912, while from April, 1912, to April, 1925, the two United companies held the entire issue of common stock with the exception of five qualifying shares of directors, and the United Company during that period exercised complete control. It is during this period of United control that the alleged unlawful payments were made. The railway company defaulted in the payment of installments of interest due January 1, 1926, July 1, 1926, and in payment of the principal sum of the bonds of $1,500,000 which became due on July 1, 1926. It was in the suit to foreclose the trust mortgage by the trustee because of these defaults that the plaintiff was appointed receiver.

Briefly, it is the claim of the plaintiff that the dividends declared are unlawful for the reason that a corporation cannot pay dividends out of capital or which will impair its capital, and it is argued that a corporation's capital is impaired when the value of its assets falls below the amount of its liabilities plus the par value of its capital stock. Plaintiff insists that the assets of the railway company were, at all times during United control, less than the amount of its liabilities and the par value of the outstanding stock and that this fact was known to the United Company which received the dividends and to the directors of the railway company when they were declared.

The cost of construction of the road was paid substantially in full from proceeds of the sale of the bonds; the stock, at least in the earlier years of the history of the company, representing little or no value. The property was entered on the books of the company, however, as having a value of $2,700,000, being the amount of the bonded indebtedness plus the par value of the outstanding stock.

During all the time that dividends, management, engineering, and contracting fees were being paid the defendant or its immediate predecessor owned all of the stock of the railway company which was one of a considerable number of subsidiaries so owned and controlled by defendant. The questions to be determined in this case depend largely upon the duty owed by the parent corporation to a wholly controlled subsidiary, and the extent to which investors who purchased long-term obligations of the corporate enterprise have the right to rely upon the management of the enterprise by the parent corporation for the protection of their interests.

It appears that in April, 1925, the defendant sold to the United Motors Products Company, of which corporation the president of defendant was also president, all of the outstanding stock of the railway company amounting to $1,200,000, $6,000 of par value of first mortgage bonds of the railway company, and the unsecured note of the railway company, the principal of which was $417,700, for the sum of $25,000 in cash, and that soon thereafter there was realized by the purchaser upon the note on principal and interest from the railway company the sum of $34,490, of which $17,700 was later refunded after protest from bondholders that no funds were left for unpaid tax assessments. Plaintiff alleges that what the defendant did in substance was to take wholly unjustified dividends, management, engineering, and other fees and payments in large amounts from the railway company through a number of years and then, when it had taken all it could, the subsidiary was abandoned and the stock sold so that the United Company was not obligated to make good its guaranty in accordance with the terms of a mortgage of the defendant by which it agreed to pay the railway company's bonds when they fell due on July 1, 1926, provided it was then the owner of the company. It is claimed that it was only because the railway company was a subsidiary of the United Company and because the directors and officers of the railway company were either employees of the railway company or officers and employees of the United Company that defendant was enabled to unlawfully divert these payments to its own treasury, thereby permitting it to show substantial earnings, which in fact did not exist, at the expense of the subsidiary.

Plaintiff claims that a corporation cannot lawfully pay dividends unless its assets are equal to its liabilities and capital stock and that the interurban railway did not at any time have assets to that amount, and that at least from 1917 it was insolvent. It further claims, even if it should be held that the railway company was solvent and its financial condition such that it was otherwise justified in paying dividends, that in any event the company must have made profits before divi-

dends could lawfully be declared and that in fact the railway company at no time had any true profits or surplus earnings out of which dividends could be paid. In this connection it is urged that in determining the profits of a street railway or other business, in addition to maintenance, it is essential that an allowance be made for accrued depreciation each year to replace property which is to wear out in the future and that there can be no true earnings until such allowance is made. Testimony was offered (see Exhibit 33) of the proper amount which should be charged for depreciation on different classes of railroad property, and it is claimed that an average of about 3 per cent. of the depreciable and about 2.7 per cent. of the total property were in the circumstances of this case minimum requirements for depreciation or replacement reserves in order to make reasonable provision to cover the original cost of various items of railway property at the time they should have been retired or replaced. It appears in this case that after setting up a small reserve out of surplus for the first few years of operation under United control, no reserve was established except for rolling stock.

■ Among the first considerations is that of the precise nature of the transactions which resulted in the alleged payment of dividends. Defendant argues that the railway company at no time accumulated sufficient funds in cash to pay these dividends. It says that all of the railroad company's cash assets were required at all times to pay for necessary additions, operating expenses, or fixed charges, and that the holding company, desiring to show a record of earnings of its subsidiary in its own accounts, arranged for the execution of notes for each dividend instead of the withdrawal of cash, and urges in substance that there can be no recovery for dividends paid only by promises which were unperformed. It is, however, clear that each dividend was formally declared at a meeting of the board of directors regularly called for that purpose, and that checks were in each instance delivered to the holding company therefor. Defendant says that this was merely a matter of accounting procedure and convenience and that in fact no assets were withdrawn from the railway company by the execution of these checks and promissory notes, and that a note of $417,760, a considerable portion of which consisted of renewals of such notes, remained unpaid in April, 1925, at the time the subsidiary company was abandoned. Plaintiff, on the other hand, insists that the loans were independent from the

dividends, and that the payment of dividends and the making of loans were not mere formal bookkeeping entries. The contention of the plaintiff in this regard must be sustained for several reasons. The notes were at no time treated by the defendant or its predecessor as merely formal. The dividends paid aggregated $579,000, while the loans for all purposes by the holding company to the railway company were never in excess of $417,700. The United Company collected interest on all such notes. It is recognized that the form of the transaction is not always controlling, but it is unquestionably pertinent evidence as to what is really the transaction. Where, as here, all of the acts relating to dividends are based upon the assumption that they are fact and not mere form, and where, at the time of closing of the relationship between the parent and subsidiary, the note then held of $417,700, instead of being surrendered to the railway company, is sold to another corporation (apparently under control of the same corporation) and payments are made thereon by the subsidiary of both principal and interest, the finding of the court must be that the transaction was in fact what it appeared to be. If the transactions involving the transfer of all the capital stock of the company and the note of $417,700 to the United Motor Products Company were wholly illusory, no proof thereof was attempted to be made, and defendant may not here rest its claim that these transactions were mere shadow upon the facts as they appear. The notes were at all times treated as valid, subsisting obligations for purpose of collection of principal, interest, and for transfer. The payments were entered upon the books of the holding company as surplus to enable it to pay its bond interest and dividends upon its preferred stock. It was in all respects treated as a real surplus and as an increase in its statement of assets. The interest collected on the notes was at rates ranging from 6 to 9 per cent. In view of these facts the finding is that dividends were paid as alleged.

It is next to be considered whether the dividends so declared and paid may be in whole or in part recovered by the plaintiff. During the period of Westinghouse control, covering a period of approximately ten years, no dividends had been paid. In December, 1912, within a few months after the United Company had acquired the property, a dividend of $42,000 was declared. Dividends were paid each year thereafter until December, 1923; the total amounting to about $579,000. The dates and amounts of

these several dividends are shown in the appended statement taken from Exhibit 49. (See note 1.) Each of these was declared at a regular meeting of the board of directors and upon a resolution to the effect that it appeared that there were then sufficient profits to warrant the payment of the dividend. The plaintiff claims that the company •was not justified, considering its financial condition from 1912 to and including the year 1923, in declaring or paying any dividends; that the company from 1917 on was in a desperate financial condition; that it required additional sums of money each year for betterments and additions amounting to approximately $50,000 a year in order to keep the property in operation; that it owed $1,500,-000 of bonds which would mature July 1, 1926, and owed large sums of money on demand notes which it was unable to finance except through the United Company; and that while the value of its property in 1912 was about equal to its debts, its indebtedness thereafter increased steadily, and that from 1916 on,·because of increased costs and the competition of the automobile, the market value of its property was less than its debts and it could not be refinanced; in fact, that it was thereafter clearly insolvent. The question is presented as to the circumstances in which a corporation may lawfully declare dividends. Plaintiff insists upon the rule that no dividends can be lawfully paid unless after such payment the fair value of the property of the corporation is equal to the par value of its capital stock and the aggregate of its indebtedness.

It is frequently stated that dividends may be declared and paid only out of surplus profits from the business and that the shareholders are not permitted to distribute the capital of the corporation among themselves under the guise of dividends. It has also been repeatedly held that dividends may be paid although the corporation is not free from debt.

As above stated, the property of the railway company was substantially contributed by the bondholders. With inconsequential exceptions, Westinghouse, Church, Kerr & Co. received all of the common stock of the company (as well as of the bonds) for their services in constructing the railroad and furnishing labor and material therefor. A small amount of capital stock not so issued appears to have been held by those who rendered the necessary legal services or performed the functions of promoters in connection with the proposed company. We have at the beginning the unique situation that the Westinghouse company was not only the contractor, but was also the owner of all of the common stock, excepting a few shares, and the original owner of substantially all of the bonds, and that it exercised complete control of the operations of the company for a period of about ten years. The company at no time possessed capital in the sense of money or property contributed or devoted to corporate activities except such as was obtained from the proceeds of sales of bonds. While it had an authorized capital stock of $1,500,000, its only capital at any time in its history in excess of bonded indebtedness consisted of that arising from profits and appreciation in the value of its assets which ensued from the establishment of good will or general increases in property values. Should it be found in this case that no dividends could legally be declared until the railway company had accumulated a sufficient sum of money to equal the par value of·its capital stock plus its secured and unsecured indebtedness, then it is clear that all dividends declared were unlawful.

While in suits brought by minority stockholders to restrain or enforce action by directors, and in suits by creditors to enforce stockholders' liability for unpaid subscriptions, it is held that the capital of a corporation is a trust fund, and that dividends are unlawful unless the corporation at the time ,of declaration has assets equal to the dividend plus the amount of all liabilities, including the par value of the capital stock, and regardless of current earnings, no case has been cited or found which applies such a principle in the circumstances here presented. It has been frequently stated that profits for dividend purposes are to be ascertained with reference to the capital stock paid in rather than to the nominal share capital. In the case of People of Colorado ex rel. Fraser v. Great Western Sugar Co. (C. C. A. 1928) 29 F.(2d) 810, 813, in discussing the general principles relating to the power of directors to declare dividends and what are to be regarded as surplus or net profits from which such dividends may be declared, the court stated:

" 'The term "surplus," as employed in corporate finance and accounting, designates an account on the books, representing the net assets of the corporation in excess of all liabilities, including its capital stock.' Edwards v. Douglas, 269 U. S. 204, 46 S. Ct. 85, 70 L. Ed. 235.

"And dividends may be paid from current earnings or accumulated surplus. Lynch v.

Hornby, 247 U. S. 339, 38 S. Ct. 543, 62 L. Ed. 1149; Moran v. United States Cast Iron Pipe & Foundry Co., 95 N. J. Eq. 389, 123 A. 546.

" 'Where a corporation has sufficient money or property with which to pay a proposed dividend without in any manner or to any extent impinging on its moneyed capital, whether such dividend shall be declared and paid and the amount, time and terms, are matters solely for the determination of the directors acting within their discretion.' Hyams v. Old Dominion Copper Mining & Smelting Co., 82 N. J. Eq. 507, 89 A. 37.

"The power of directors is absolute if they act in the exercise of an honest judgment, and earnings of prosperous years may help out the deficiencies of other years. Murray v. Beattie Mfg. Co., 79 N. J. Eq. 604, 82 A. 1038. And dividends may be declared where there are profits above the actual assets with which the corporation began business (Goodnow v. American Writing Paper Co., 73 N. J. Eq. 692, 69 A. 1014), and this is true although the total assets may not exceed the debts and the nominal share of capital. In the granting of dividends the directors are vested with a wide discretion, subject to intervention for improper refusal. Stevens v. United States Steel Corporation, 68 N. J. Eq. 373, 377, 59 A. 905. Such dividends need not be declared out of the profits for the current year. Bassett v. United States Cast Iron Pipe & Foundry Co., 74 N. J. Eq. 668, 70 A. 929. A surplus not dedicated to corporate uses as capital is carried as the property of the corporation, until such time as the directors may decide as to its disposition by way of distribution or otherwise. Robertson v. De Brulatour, 188 N. Y. 301, 310, 80 N. E. 938. And when the property of a corporation exceeds the sum limited for its capital in its charter, the excess is surplus, which may be divided among the stockholders. Williams v. Western Union Telegraph Co., 93 N. Y. 162.

"The general rule is thus well summarized in 14 Corpus Juris, 802:

" 'The terms "net profits" or "surplus profits" may be defined as what remains after deducting from the present value of all the assets of a corporation the amount of all liabilities, including the capital stock, in other words, that which remains as the clear gain of a corporation, after deducting from its income all the expenses incurred and losses sustained in the conduct and prosecution of its business. Hence a dividend is lawful, if, at the time of its declaration and payment, the corporation is solvent or has assets in excess of the amount of its debts and capital stock. And it makes no difference whether such surplus assets have been carried on the books of the corporation as surplus, or as segregated assets, or in a special fund account, or otherwise. Dividends may be paid from surplus accumulated out of profits of previous years, although there has been no actual profits for the year in which dividends are paid. The actual value of the assets with which the corporation began business is to be deducted and not the nominal share capital, and the business of a corporation is to be viewed as a unit in determining whether or not there are net profits.'

"It is evident from the foregoing citations, and from many others which might be adduced to the same effect, that the sum accumulated by appellee in the way of surplus or undivided profits, was subject to the control of the directors and might be applied to the payment of dividends at any time when such payment would not impair the capital of the corporation."

In the case of Goodnow v. American Writing Paper Co., 73 N. J. Eq. 692, 69 A. 1014, 1016, in discussing a section of the New Jersey statute not dissimilar from that found in section 23 (see note 2) of the Street Railway Act (Comp. Laws Mich. 1929, § 11313), under which this railway company was organized, it was said:

"We are led to the conclusion that the words 'capital stock' in the first instance mean capital actually invested, by the fact that it is only actual assets that can be divided, withdrawn, or paid over. These words are not apt words to apply to nominal or share capital, which may be reduced, but can hardly be withdrawn, divided, or paid over. This capital actually invested does not include net profits arising from the business of the company, for the reasons that the language of the section itself makes a distinction between the declaration of dividends and of profits and the withdrawing of capital; that another method of securing payment of the par value of the stock is provided in other sections of the act; that the policy to be served by the prohibition of section 30 is to prevent the frittering away of the actual assets with which the company is to do business, not the nominal assets which it has never received, and for which it still has a claim against the subscribers for unpaid stock. The section distinguishes between surplus and net profits; but if the complainant is correct in his contention that net profits mean

only the excess above the share capital, we see no distinction in fact, but only in book-keeping entries.

"It may not infrequently happen that stock is issued on which, avowedly, only a partial payment is made of the amount subscribed, which is therefore subject to further calls. We cannot think that, in such a case, where the company prospers, there are no net profits available for dividends until the earnings accumulate to an amount equal to the par value of the shares. The complainant's brief concedes this, and the concession seems quite fatal to his argument."

While some authorities have taken the view that the payment of dividends out of capital is in all cases a voluntary disposition of the assets of the corporation that impairs its capital, though the payment is made in good faith (see Detroit Trust Co. v. Goodrich, 175 Mich. 168, 141 N. W. 882, Ann. Cas. 1915A, 821), the federal courts have quite uniformly held against the right to recover dividends paid out of the capital of a corporation when the stockholder acts in good faith and the corporation is not at the time insolvent. See McDonald, Receiver v. Williams, 174 U. S. 397, 407, 19 S. Ct. 743, 747, 43 L. Ed. 1022. There the court said: "The declaration and payment of a dividend is part of the course of business of these corporations. It is the thing for which they are established, and its payment is looked for as the appropriate result of the business which has been done. The presumption of legality attaches to its declaration and payment, because declaring it is to assert that it is payable out of the profits. As the statute has provided a remedy, under section 5205 [12 USCA § 55], for the impairment of the capital, which includes the case of an impairment produced by the payment of a dividend, we think the payment and receipt of a dividend, under the circumstances detailed in the question certified, do not permit of its recovery back by a receiver appointed upon the subsequent insolvency of the bank." See, also, 3 R. C. L. Supp. 1961.

Applying these principles, the important question for determination is whether at the time of the declaration of the several dividends the capital of the railway company was so far impaired as to indicate a lack of good faith upon the part of the directors in declaring such dividends and upon the part of the stockholder in receiving the same. Determination of this question involves the necessity of considering the financial status of the corporation on these occasions. The voluminous record in this case is devoted largely to evidence bearing upon this issue. Review and discussion of the verbal testimony and numerous exhibits would unduly extend this opinion, and only a comparatively brief outline is possible.

Upon this phase of the case it is the theory of plaintiff that the railway company's capital was at all times during United control so seriously impaired as to make unlawful the payment of dividends. This theory is supported by evidence of expert witnesses who testified that in order to ascertain the true value of the tangible property it was essential that the railway company should set up a reserve for depreciation in substantial accord with the classification of accounts of the Interstate Commerce Commission promulgated July 1, 1914. From inspection of the physical properties made in November, 1927, reports made to the Interstate Commerce Commission and to the Michigan Public Utilities Commission, reports made to the defendant by the subsidiary company, and certain inventories, plaintiff has prepared documents, the more important of which are known in this case as Exhibits 27, 30, and 37, which fairly represent its position as to the financial condition of the company throughout its history. Exhibit 27 (appended as note 3) is a summarized income account for the period of United control from 1912 to 1925 with depreciation and alleged excess net retirements, based on actual cost to the operating company, with recognition of the depreciation which is claimed to have existed prior to the year 1912. It is a continuation by years of Exhibit 30 (summarized in note 4) which shows the amounts of reserve for depreciation which, upon plaintiff's theory, should have been set up during the years from 1902 to 1912. It is plaintiff's contention that the accounting of the railway company was erroneous in that the amounts set up in these exhibits for depreciation and excess net retirements should have been deducted from operating expenses, and that the effect upon the value of the fixed tangible property of the railway company would have been as shown in Exhibit 37 (summarized in note 5).

From these exhibits and others in support and explanatory thereof, it is claimed that it is established that at no time has there been any surplus available for dividends and that all dividends which have been paid since 1915 at least have been taken from capital. The rates of depreciation used are shown in the second column of Exhibit 33 (appended as

note 6) which are the rates claimed to be proper to retire aging property units when they reach the end of their respective lives.

Exhibit 37 (see note 5) shows plaintiff's claim, in the first column, of fixed tangible property for each year; in column 2, the correct balance in the depreciation reserves at the end of each year; and in column 3, the alleged true value of the investment of the company from year to year and the amount that should have been taken into account by the board of directors in considering the payment of dividends. The failure to show this reserve for depreciation upon the books of the company is said by plaintiff to have resulted in concealing a serious impairment in the capital of the railway company.

■ Many rules have been promulgated for determining value. The determination of value is not a matter for formulas or artificial rules, but of sound judgment and discretion based upon a consideration of all the relevant facts in a particular case. Simpson v. Shepard, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. "Value," in the final analysis, is only the effect of the relative human desire for compared objects expressed in terms of a common denominator. International Harvester Co. v. Kentucky, 234 U. S. 216, 34 S. Ct. 853, 58 L. Ed. 1284; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165. While it has been said that value is the same for all purposes, it is clearly true that the weight to be given various elements will vary with the circumstances of each case, and may vary with the purpose for which value is to be ascertained. The same elements of value for rate making may be accorded different authority when considered for income tax purposes, or for the purpose of determining the right of directors to declare dividends.

The different tests suggested for determining values of properties of public utilities produce widely divergent results. Witnesses for opposing parties in this case have applied various tests such as reproduction at cost less depreciation, capitalization of net earnings on various rates of return, original cost less depreciation, and current market values of stocks and bonds.

The following facts have an important bearing upon the value of the railway company's property at different periods in its history: It is practically conceded that in 1902 the original cost of construction and equipment was $1,276,379.23. The total cash and securities received by Westinghouse,

Church, Kerr & Co. from the railway company in payment therefor was $1,553,098.25, which may fairly be assumed to be the cost to the railway company including contractor's profit and discount upon sale of bonds, and is a percentage increase of 21.68 over original net cost.

On December 31, 1911, the company, then under Westinghouse control, had a surplus of $43,019.47, and inasmuch as no dividends had been paid and no depreciation taken into account, this sum represents the entire earnings of the company to that date.

In April, 1912, the United Light & Railways Company assumed the bonded indebtedness of $1,500,000, and in addition thereto paid $300,000 for the entire capital stock of the company, and it may be fairly assumed that the property of the company had a fair market value as of that date of $1,800,000, though it appears from Exhibit 30 that had the system of accounting and of setting up reserves for depreciation been applied to the property through the years of Westinghouse control (as urged by plaintiff) the books would have shown an accumulated deficit December 31, 1911, of $368,439.79.

In the year 1918 in a rate case (Grand Rapids, Grand Haven & Muskegon Railway Co. v. Groesbeck, Attorney General) the decree of this court found the fair value of the property for rate making purposes to be $1,800,000 without allowance for going value, working capital, or materials and supplies.

In the years 1921, 1922, and 1923 there was an inventory and appraisal of the property by the Froehlich and Emery Engineering Company under the provisions of the Glaspie Act (an act fixing rates for interurban electric railways, Act No. 115, Public Act 1921), by which it was found that the cost to date of the railroad as of October 1, 1921, was $1,944,143, and that reproduction cost new less depreciation was the sum of $2,562,489, without allowance for working capital, materials, supplies, or going value.

In 1925 (as previously stated) all of the capital stock of the corporation, $6,000 of its bonds, and its note for $417,700, were sold to the holding company for $25,000.

It appears from Exhibit 55 that during the year 1928 substantially all of the physical assets of the company under the order of this court were sold by the receiver for the sum of $237,148.71.

In addition to the bonded indebtedness of $1,500,000, Exhibit 25 shows that on December 31st of each of the years in question there existed current liabilities of the company (in-

520

cluding notes payable) as follows: 1912, $147,575.65; 1913, $182,988.98; 1914, $167,-585.65; 1915, $169,801; 1916, $223,031.15; 1917, $263,512.80; 1918, $255,789.75; 1919, $246,731.57; 1920, $327,699.85; 1921, $328,-879.20; 1922, $354,393.23; 1923, $425,976.-80; 1924, $438,787.11; and 1925, $464,744.-88.

Each of the foregoing determinations of values obviously includes elements proper for consideration of the board of directors in exercising its discretion in the declaration of dividends, and each of them excludes certain other elements which clearly are proper for such consideration. None of them, of course, took account of existing liabilities. Each seems to have represented a fair determination of the value of the physical property as it existed after giving due weight to the elements which then were under consideration, and the purposes for which the value was being ascertained. In both the rate case of 1918 and the appraisal under the Glaspie Act, depreciation in its ordinary meaning, was given due weight.

It appears, however, from the record in this case that among the most skilled accountants and engineers the word "depreciation" has a variety of meanings depending greatly for its precise significance upon its application and the circumstances under which it is used.

It was defined by Professor Riggs (a witness for plaintiff) as "a subnormal condition of physical property such as to impair the capacity for service, usefulness, and the intrinsic value of the investment," while another of plaintiff's witnesses defined it as "an amount of money that ought to be set up in a reserve as representing that part of the cost or other basic value of a piece of property which can be reasonably imputed to operating expenses during the period the property has been in use." Various other definitions were given or attempted, each of which appears inaccurate in certain aspects. Depreciation in the ordinary sense is represented by the number of dollars necessary to rehabilitate the property sufficiently to place it in safe condition for operation, while the reserve for depreciation is generally considered as a reserve for the equalization of large retirements. An important question is whether such a reserve is essential if it appears that the property is well maintained from operating income.

Review of the voluminous testimony and of the numerous exhibits in this case with reference to the maintenance of the property of the railway company makes clear that, with few exceptions, all of the property was well maintained up to the time of its abandonment by the holding company in 1925. This is demonstrated by the comparative amounts spent for maintenance upon this property and other similar properties throughout the United States. It is convincingly established by the testimony of those who made an unusually careful inspection of the property in 1922 and 1923 under the direction of Froehlich & Emery Engineering Company. The failure on the part of the railway company to set up on its books a theoretical reserve for depreciation, so far as depreciation involves a subnormal condition of physical property, and the failure of the board of directors to take such depreciation into consideration in declaring dividends, cannot therefore be regarded as a basis for recovery in this case. Neither could the failure to set up a reserve for depreciation, in the sense of equalization of the cost of large retirements, be so considered. This was not required by the rules promulgated by the Interstate Commerce Commission in 1914 (except as to rolling stock and equipment), and, so far as disclosed by the record in this case, the custom of accountants generally establishes no such uniform practice as to make the failure to set up such accounts an evidence of lack of good faith on the part of the directors in making distribution of earnings among stockholders. Even though the failure to do so were a violation of such rules and practice, a board of directors would be chargeable with bad faith only in event it failed to make due recognition of the fact of depreciation, and then only to the degree it existed and actually impaired capital which should have remained for the protection of the claims of creditors.

It is plain here that the loss to the bondholders and creditors was occasioned not by the failure of the company to install a certain system of accounting, nor its failure to set up on the books a reserve for depreciation, nor to a failure of the management to adequately maintain ways, structures, and equipment. The loss was the direct and inevitable result of what has been referred to by the courts as external obsolescence, rather than physical deterioration. The entire physical property, within the space of a few years, became worthless as an interurban railway, for want of patronage. It was a short electric line intended for the carriage of passengers and light freight. The low-

priced automobile which resulted largely in consequence of quantity production, the general prosperity of the masses of the population, the construction of hard-surfaced highways between the principal cities served by the railway, and the almost universal use of the automobile for short journeys, largely eliminated the demand for the type of service for which this public utility was designed. The remaining small patronage by passengers was insufficient to warrant the expense of operation. The freight traffic was also substantially lost to freight carrying trucks operating upon the hard-surfaced roads parallel to the right of way of the interurban. The obsolescence which affected the Grand Rapids, Grand Haven & Muskegon Railway Company likewise smote practically all other similar enterprises. Within a short period of time practically all had ceased operation and were in process of liquidation. The few remaining were those operating in metropolitan areas or in localities where affiliation with light and power companies was feasible.

Webster defines "obsolescence" as a condition or process of gradually falling into disuse. In its ordinary application it refers to what has been termed "functional depreciation" which results from the necessary replacement of equipment, before it is worn out, by reason of invention and improved appliances which render more efficient and satisfactory service. The distinction between ordinary depreciation and the usual type of obsolescence was well stated in the case of People v. State Board of Tax Commissioners, 69 Misc. 646, 127 N. Y. S. 825, 832, 834, as follows:

"As surely as humanity travels to the grave, the machinery and equipment of a public service corporation travel toward the scrap pile. The plant and structures depreciate in less degree, but as certainly. This is ordinary depreciation. But another form of depreciation in the case of properties here being valued takes place. The machinery or equipment, while still capable of years of service, becomes inadequate to do the work demanded—not only by the corporation, but by the law itself. In the case particularly of electrical machinery, the type becomes obsolete by reason of invention, and increasing public demands frequently require in aid of safe and adequate service that the obsolete appliance or equipment give way to the new. * * *

"To provide safe and adequate service is not to maintain old and obsolete cars, even though by constant repair they may be kept from dissolution. It is to keep in touch with the times, and to displace obsolete or inadequate appliances or structures with new and approved appliances. These expenditures come suddenly in some cases—in others their approach may be apprehended."

The functional depreciation there referred to was of the internal type affecting only certain machines or equipment. The same principles, however, would seem to be applicable to the type of external obsolescence which may and frequently does affect the entire plant of a public utility. Depreciation due to this external obsolescence may, as stated in the above quotation, come suddenly, or its approach may, in other cases, be apprehended. Its effect, in any event, is to substantially diminish values. The earning capacity of a public utility is one of the principal indices of its value and the type of obsolescence here present vitally affected the net earnings of this utility.

It has been well said that the attempt to determine true market value of a public utility is not amenable to any formula. No elements may properly be rejected. Each must be given due weight. Perhaps the most important consideration in determining value of such a utility is its history of net earnings, its present ability to show such earnings, and reasonable assurance of their continuance. Due consideration and weight being first given to the various elements of value, a board of directors is justified in declaring a dividend if honestly of the opinion that such earnings exist and that the capital of the company will not be impaired thereby. In determining true market value and impairment of capital, depreciation, in its ordinarily accepted sense, is always an element for consideration. It seems to the court to be equally true that that type of depreciation due to obsolescence of the entire plant of a public utility is likewise an important element in the determination of these questions. It is true that much must be left to the discretion of the board of directors and that the presumption is that it acted in good faith.

This type of depreciation was not taken into consideration in the values of the property fixed in the rate case in 1918, nor in the Froehlich & Emery appraisal as of October 1, 1921, made under the direction of the Michigan Public Utilities Commission. It is clear, however, that it was thoroughly recognized by the board of directors of the parent company when the entire capital stock of the railway company of a par value of $1,200,000 plus $6,000 of bonds of the subsidiary company, with a note of the subsidiary

to the holding company for $417,700, was sold on March 1, 1925, for the sum of $25,000. It is also apparent from that transaction that the board of directors was fully aware that the outstanding bonds of the railway company were not worth their then market quotation of 99½.

This unmistakable recognition of impairment of value was not the result of sudden and unexpected catastrophe. Its approach was clearly recognized by the holding company at least as early as 1918 (see letter dated April 4, 1918, Plaintiff's Exhibit 42), and in 1921 (see letter February 5, 1921, Plaintiff's Exhibit 42). It was apparent from the loss in passenger traffic in 1921 as shown by the following table of number of passengers carried from 1912 to 1923:

| | |
|---|---|
| 1912 | 1,058,273 |
| 1913 | 1,137,518 |
| 1914 | 1,149,041 |
| 1915 | 1,054,388 |
| 1916 | 1,151,159 |
| 1917 | 1,194,362 |
| 1918 | 1,126,804 |
| 1919 | 1,288,820 |
| 1920 | 1,367,648 |
| 1921 | 993,682 |
| 1922 | 884,862 |
| 1923 | 810,731 |

The number of revenue passengers carried per thousand of estimated population in the district directly served by the railway company for the years 1912 to 1923 was shown to be as follows:

| | |
|---|---|
| 1912 | 668.8 |
| 1913 | 698.1 |
| 1914 | 685.4 |
| 1915 | 610.5 |
| 1916 | 633.4 |
| 1917 | 658.1 |
| 1918 | 604.8 |
| 1919 | 674.9 |
| 1920 | 698.2 |
| 1921 | 495.4 |
| 1922 | 431.0 |
| 1923 | 321.8 |

This decline in patronage during years of comparative general prosperity was clearly indicative of loss of business immediately following 1920. It was more clearly apparent in the decrease in net earnings. The board of directors was faced with the fact that $1,500,000 of bonds would mature on July 1, 1926, and that the possibility of refinancing was remote. Tables indicating its ability to refinance based upon net earnings and the market value of its bonds are of little value in view of the incontrovertible fact that the board of directors knew of the decreasing patronage and earnings and must have known that the market value of these bonds resided largely in the general belief of the investing public that they were protected by a guaranty of payment by the holding company. They must also have known that this guaranty was largely mythical in view of the fact that it was given only for the benefit of the owners of the refunded bond issue of the parent company, and that the guaranty was expressly made subject to a condition which it was wholly within the power of the guarantor to render ineffective by transfer of the ownership on any date prior to the due date of the bonds. This possibility became a reality on March 1, 1925, and the market value of the bonds was immediately and substantially impaired.

The sharp decline in net earnings and passenger traffic, notwithstanding the general prosperity prevailing throughout the country during the greater portion of 1922 and throughout 1923, should have made it apparent to the board of directors of the subsidiary company at least as early as 1922 that any hope for the future of electric railways was a forlorn one. The obsolescence due to decreased patronage was no longer theoretical; it had become an accomplished and evident fact. It necessarily affected the net earnings and therefore the true value of the capital assets of the company. The extent to which this value was thereby affected is, of course, largely conjectural. Regardless of theories of depreciation in accounting systems, it was in any event a fact of outstanding importance for consideration of the board of directors in declaring dividends. The desperate condition of the industry as a whole was indicated by the appointment by President Wilson on May 31, 1919, of a Federal Electric Railways Commission, the report of which on July 28, 1920, made clear the precarious status of the securities of such utilities and the impossibility of refinancing, and verified the prediction prior to appointment that the industry as a whole was "virtually bankrupt." As against these known facts the board had the undoubted right to consider that in point of net earnings and number of passengers carried its business for the years 1919, 1920, and 1921 had been comparatively large and profitable, and to hope that through public regulation of competing freight trucks and passenger busses,

the value destroyed by this competition might be in some measure restored, and that the habits and desire of the population to travel in private conveyances might undergo another sudden change. Nothing, however, is found in the record to justify the translation of that hope into such reasonable belief as would justify the declaration of large dividends in view of the record of greatly diminished net earnings and patronage.

It is the view of the court that at least by the month of December, 1922, this obsolescence had reached the point where the capital assets of the subsidiary company, without consideration of the par value of the capital stock, were reduced to a point substantially below its bonded indebtedness of $1,500,000, its note indebtedness of $311,508.00, and a substantial amount of current indebtedness. For the holding company thereafter to pay to itself large dividends in utter disregard of the ability of its subsidiary to meet its obligations was a lack of good faith to creditors, and especially to bondholders who had contributed substantially all of the original investment. The desperate financial plight which made advisable what in practical effect was a gift of the entire property on March 1, 1925, was unmistakably foreshadowed at least prior to December, 1922, by conditions already referred to, and the approaching maturity of bonds, the payment or refunding of which upon maturity was then clearly impossible. Officers of the holding company testified to the visible effect of bus competition in 1921 or 1922 after paving for some distances out of Grand Rapids and Muskegon had been completed. Such expenditures as were thereafter made upon the property were of a character and in amount wholly different from such as would justify a conclusion contrary to that here reached. It must then have been apparent that the condition of the company was that of clear insolvency and that hopes for restoration were barren of substantial foundation. It was practically certain at least during the latter portion of 1922 that in the absence of unforeseen and unanticipated assistance for the railway company the bondholders would suffer substantial loss unless the conditional guaranty of the holding company should be performed. Dividends thereafter were unwarranted and illegal. That the books of the corporation then disclosed a surplus is not of controlling importance. If theoretical accounting fails to record obvious facts, the duty of the board of directors in considering declaration of dividends is not performed unless such facts are given due weight and consideration. As heretofore stated, the fact of depreciation through obsolescence was too apparent to be overlooked prior to the date of the 1922 dividend, and at all times subsequent thereto. Any amounts paid thereafter in dividends clearly resulted in impairment of capital assets. The dividends of December 20, 1922 (amounting to $72,000), and December 10, 1923 (amounting to $30,000), should be restored with interest at 5 per cent. from date of payment. The conditions prevailing when dividends were declared prior to those dates were not, in view of the presumption already referred to, sufficiently conclusive of present or ultimate insolvency to warrant relief to plaintiff.

Involving, as they do, substantially the same principles, the issues relating to management fees, and contractor's and engineering fees, may be discussed together. It is not disputed that such fees were paid to defendant or its predecessor as shown by Plaintiff's Exhibit 54, and were as follows:

| Year | Mgr. Fees. | Contr. & Eng. Fees. |
|------|-----------|---------------------|
| 1912 | $ 1,500.00 | |
| 1913 | 6,000.00 | |
| 1914 | 6,000.00 | $ .24 |
| 1915 | 6,000.00 | 702.80 |
| 1916 | 6,000.00 | 5,058.88 |
| 1917 | 9,405.16 | 4,116.58 |
| 1918 | 9,457.93 | 1,246.09 |
| 1919 | 20,691.47 | |
| 1920 | 23,241.64 | 6,327.51 |
| 1921 | 20,573.50 | 1,291.95 |
| 1922 | 20,761.74 | 6,611.19 |
| 1923 | 19,908.53 | 4,793.17 |
| 1924 | 16,240.90 | 2,827.10 |
| 1925 | 3,546.84 | 28.69 |
| | $169,327.71 | $33,004.20 |

It is conceded that during the years 1919 and 1920 the defendant also received for such services as it rendered in connection with the rate case of 1918 a total of $10,386.23.

Until the year 1917, the amounts stated in the above tabulation were paid without express contract therefor. On November 8, 1917, a written contract for management was entered into (made retroactive to January 1, 1917) which provided for compensation at the rate of 2 per cent. of gross earnings. A second management contract was entered into in December, 1919, increasing this rate to 3½ per cent.; this contract likewise being made retroactive to January 1, 1919. In 1917, an engineering contract was executed which provided for different kinds of engineering services to be paid for at varying

rates. In 1921, this contract was superseded by two contracts, an engineering contract and a contractor's contract, covering in effect the same services as had been previously covered by the engineering contract of 1917.

It is urged by the plaintiff that contracts such as these (whether implied, as in the earlier years, or express, as in the later years), made by a sole stockholder through its control of the directorate of the subsidiary company party to the contract, are not merely voidable but are completely void, and that the holding company must be remitted to a claim for the fair value of the benefit actually received, citing Miner v. Belle Isle Ice Co. et al., 93 Mich. 97, 53 N. W. 218, 17 L. R. A. 412; Jones v. Green, 129 Mich. 203, 88 N. W. 1047, 95 Am. St. Rep. 433; Sant v. Perronville Shingle Co., 179 Mich. 42, 146 N. W. 212; McKey v. Swenson, 232 Mich. 505, 205 N. W. 583, and Alfred J. Brown Seed Co. v. Brown, 240 Mich. 569, 215 N. W. 772. With the exception of the McKey case all of these are cases in which stockholders sought to obtain relief for wrongs perpetrated by officers who were in a fiduciary capacity as to minority stockholders. The McKey case was brought by a trustee under a voluntary assignment for the benefit of creditors against the directors of a corporation who had obtained excessive salaries which had very materially impaired the capital of the corporation. Here the facts and the principles involved are substantially different. The inquiry here concerns the relationship between a holding company and the creditors of its subsidiary, and particularly the extent to which contracts between the two corporations may be held void or voidable if found to be unfair.

█ The use of the auxiliary and subsidiary corporation in recent years has been greatly extended. That they serve highly useful and legitimate purposes in many instances cannot be denied. Neither can it be controverted that many times they have been used as means of evasion of restrictive legislation relating to corporate powers and management, and that tremendous losses have resulted to both creditors and stockholders because the dominating management of the holding company has frequently manipulated the property and credit of the controlled corporation primarily to serve its own ends. The opportunities and temptations arising from the relationship are too obvious to require elucidation. Holders of bonds of a subsidiary should have the right to rely upon faithful management of the enterprise and the fidelity and integrity of those who control its destinies. When the dominating corporation has received reasonable compensation for those services and duties performed which are beyond those of a stockholder for the protection of his investment, and has been paid its lawful returns in the form of dividends upon its stockholdings, any additional sums obtained should in event of insolvency be recoverable for the benefit of creditors whether secured or general. To deplete the assets of a subsidiary without consideration for the sole benefit of the holding company with resulting loss to existing general creditors is an abuse of corporate powers. Contracts for payment of management, engineering, and contractor's fees are subject to careful scrutiny by courts, and if evidence exists of overreaching, made possible by the lack of interested representation on behalf of one of the parties, there should be no hesitancy on the part of a court of equity in requiring restitution. Such contracts are not void [see Pittsburgh & W. V. R. Co. v. U. S. (D. C.) 41 F. (2d) 806, 811], but are voidable on behalf of creditors to the extent that they result in diverting assets of the subsidiary without consideration. The contention of defendant that such a stockholder may take all of the surplus earnings of the subsidiary and give them away without consideration is unsound. The right to declare dividends from such earnings is not to be denied, but funds distributed to stockholders in payment for services not rendered must be restored to the treasury of the subsidiary, or to its successor for the benefit of creditors. As against creditors, and in those circumstances, courts should not assume for the benefit of the holding company, that such fund would otherwise have been expended for improvement of the corporate property, or for lawfully declared dividends. This is certainly true where, as in this cause, it is claimed by defendant that the property was adequately maintained, and the record evidences a purpose not to accumulate a surplus but to distribute all possible earnings to the sole stockholders.

█ Applying the principle that courts will scrutinize with great care the relationship between a corporation acting in a managerial capacity and the utility over which it exercises absolute control, and upon consideration of the evidence submitted as to the nature and extent of services rendered, it is the view of the court that the charges made cannot be justified in their entirety. It appears beyond question that the railway company had been competently and efficiently managed during

the ten years of Westinghouse control, and that substantially the same corps of officers remained throughout the period of United control. There can be no doubt that these officials, who were paid from the treasury of the railway company, were sufficient to manage and operate the road in all of its usual activities. The railroad was comparatively small, and presented no extraordinary problems either of management or engineering. It had at all times a general manager, traffic manager, general accountant, trainmaster, roadmaster, and foreman of bridges and buildings. The management services for which charges were made consisted of such general supervision as the holding company thought advisable to give, and are set forth in the formal contract as including (in substance) the following: Supervision and management of the company; making complete examination of the property of the company and suggestions relating to operation of the same;. the superintendence of keeping of books and accounts, and to have the books and accounts audited; the supervision of the preparation and filing of local, state, and federal reports; to act as chief engineer of the company in its management and operation; to permit its officers and employees to act as officers and directors of the company; to direct and advise relative to fire and accident insurance; to furnish fiscal agency service, including negotiation and sale of securities; to purchase necessary materials for the account of the company; and to employ the manager of the company.

The testimony as to services performed under this contract is comprehensive, and detailed discussion of it would serve no purpose. Consideration of the record in this regard results in the conclusion that services of a substantial nature were rendered, but that they were general in their nature. To a considerable extent they appear to have been for the benefit and protection of the interests of the holding company and, speaking generally, such as might have been and in fact were adequately performed by the subsidiary, both before and after United control. It is true that valuable services were rendered in connection with the litigation in the rate case (which was, however, fully compensated for) and in activities to secure legislation favorable to the railway company. There can be no doubt that there were benefits to the subsidiary by way of suggestions relative to internal corporate activities and expenditures, in advising in connection with insurance matters, and in effecting economies in purchase of equipment and materials.

With reference to the engineering contract and contractor's contract, it is reasonably clear that the services (except in a few instances) for which compensation is claimed were such as were well within the scope of the capacity and duties of the organization which the railway already possessed when it came under United control, local surveyors and engineers being occasionally employed. The exceptions relate to the installation of several substations, revamping the power house at Fruitport, erection of a freight house, filling the Fruitport trestle, and paving at Spring Lake and Coopersville. Considerable time was also expended by officers and employees of the holding company upon various engineering problems which presented themselves from time to time, many of the contemplated projects being abandoned. Considering the testimony in its entirety, the court is of the opinion that the charges collected are greatly in excess of the real value of the contracting and engineering services rendered.

It is of importance to note that during the first four years of United control the total contracting and engineering fees amounted to $703.04, and that for the years 1916 to 1925, they amounted to in excess of $32,000, with no substantial increase in the length of the road or its capacity, except as above noted.

During the years 1913, 1914, 1915, and 1916, charges for management fees were at the uniform rate of $6,000 per year. The charges for 1917 and 1918 represented an increase of over 50 per cent. with no corresponding additional responsibilities of management so far as is disclosed by the record. Beginning with the percentage contract of 1919 the charges for the next five years were, on the average, in excess of $21,000 a year.

It is the view of the court that these charges were excessive and clearly unjustified. Careful consideration of the record convinces the court that a fair charge for the years from 1917 to 1925, inclusive, is represented by the charge made for each of the four years preceding that period. All sums above that rate per annum should be paid to the receiver with interest at the rate of 5 per cent. per annum from the date of the respective payments as disclosed by the record, this allowance to cover such services in the way of minor engineering work, contemplated and performed, as are shown by the testimony. In computing this amount due recognition must be given the fact that in 1925 United control continued for only a short period.

With reference to engineering charges made in connection with the more important matters previously referred to, it appears that the work of the engineers of the United Company did not at any time extend beyond the preparation of blueprints and general supervision of the project. The contracts for engineering disclose that when the holding company's work did not extend beyond supervision the highest charge therefor was on a basis of 5 per cent. of the total cost. The cost of this engineering work appears to have been approximately the sum of $216,-000. An allowance of 5 per cent. upon the total cost of these several major engineering contracts is, in the view of the court, ample compensation for such services and all sums paid in excess thereof should be returned to the receiver with interest at the rate of 5 per cent. from the dates of the respective payments as shown by the record.

The statute of limitations has been pleaded and if applicable in this case would bar a considerable portion of the recovery for payments made for management, engineering, and contractor's fees. The bill of complaint was filed December 18, 1926. If the state statute is applicable, all payments prior to December 18, 1920, are barred. It has been repeatedly held that the federal courts, sitting in equity, are not bound by the statute of limitations of the states, but that in proper cases the doctrine of laches will be applied in analogy to the statute of limitations of the state relating to actions at law. In the case of Kelley v. Boettcher et al. (C. C. A.) 85 F. 55, 62, it was said: "In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. Rugan v. Sabin, 10 U. S. App. 519, 534, 3 C. C. A. 578, 582, and 53 F. 415, 420; Billings v. Smelting Co., 10 U. S. App. 1, 62, 2 C. C. A. 252, 262, 263, and 51 F. 338, 349; Bogan v. Mortgage Co., 27 U. S. App. 346, 357, 11 C. C. A. 128, 135, and 63 F. 192, 199; Kinne v. Webb, 12 U. S. App. 137, 148, 4 C. C. A. 170, 177, and 54 F. 34, 40; Scheftel v. Hays, 19 U. S. App. 220, 226, 7 C. C. A. 308, 312, and 58 F. 457, 460; Wagner v. Baird, 7 How. 234, 258 [12 L. Ed. 681]; Godden v. Kimmell, 99 U. S. 201, 210 [25 L. Ed. 431]; Wood v. Carpenter, 101 U. S. 135, 139 [25 L. Ed. 807]. The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it."

In the circumstances of this case it would be inequitable to apply the doctrine of laches against the claims of the receiver. The recovery is sought for bondholders who, as previously observed, were lulled into a sense of security by prompt interest payments, the belief that the market value of their bonds was approximately par, and that their payment was guaranteed by the parent company. There is no evidence that any bondholder was aware of the precarious status of his security or of the excessive charges here complained of until shortly before the receivership proceeding. Until the railway was abandoned by the holding corporation the bondholders were fully justified in the belief that their bonds would be paid in full. The doctrine of laches should not be applied when its result will be to defeat justice, and time should not run against creditors of a corporation the property of which has been taken without fair consideration and without their knowledge.

The claims of the plaintiff for interest charges made by the United Company in excess of the legal rate of 5 per cent. remain to be considered. It appears that beginning with the year 1915 the holding company loaned large sums of money to the railway company. For the first two years the charges were at the rate of 8 per cent. per annum. In 1917 the rate was increased to 9 per cent., and this rate continued through the years 1918, 1919, 1920, 1921, 1922, and 1923, with some exceptions when a rate of 8 per cent. was charged. The total interest charges were $152,858.06. Had interest been charged at the rate of 7 per cent., the maximum rate allowed under Michigan statutes, the excess paid would amount to $29,873.08, and if at the rate of 5 per cent., the excess would be $64,972.69.

The circumstances of this case, however, appear to disclose a sale of credit rather than the loaning of money. This distinction was recognized by Judge Manton in the case of Philadelphia Warehouse Co. v. Seeman (C. C. A.) 7 F.(2d) 999, 1001, in the following language: "The courts have long recognized the difference between a lending or sale of

credit and the lending of money, and have repeatedly held that for a lending or sale of credit any price demanded may be paid by the borrower without subjecting the contract to the taint of usury. Ryttenberg v. Schefer (D. C.) 131 F. 313; Title Guarantee & Surety Co. v. Klein, 178 F. 689, 102 C. C. A. 189, 29 L. R. A. (N. S.) 620; Meaker v. Fiero, 145 N. Y. 165, 39 N. E. 714. In order to taint a loan with usury, a corrupt purpose or intent on the part of the person who takes the security to secure an illegal rate of interest for the money or forbearance of money must exist as a fact or in law. There must be a lender and a borrower, and it must appear that the real purpose of the negotiations and transaction was, on the one side, to loan money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender. Orvis v. Curtiss, 157 N. Y. 657, 52 N. E. 690, 68 Am. St. Rep. 810. Any person is at liberty to sell his credit at whatever price he can get for it, precisely as he is at liberty to sell any other commodity which he may have. If the transaction is in good faith, and not a mere cloak or device for covering a usurious contract, a greater discount may be charged than the prescribed rate of interest without contravening the usury laws."

In Michigan the usury statutes are held to be penal in character and subject to strict construction. See Vandervelde v. Wilson, 176 Mich. 185, 142 N. W. 553.

It is clear that the defendant at no time had money of its own to loan. It was itself, throughout the period covered by the alleged illegal interest charges, a large borrower at high rates of interest. It appears from Defendant's Exhibit YY that the actual cost of money to the parent company during this period ranged from 7.92 per cent. to 10.61 per cent. It is a matter of common knowledge that interest rates were high and that borrowing by public utilities was difficult during these years. There is no denial of the fact that the railway company was at all times seriously in need of funds, and it is clear that it was capable of meeting its needs upon its own credit only in comparatively small amounts. The court is unable to find in these circumstances evidence of corrupt purpose to loan money at illegal rates of interest. See Equitable Trust Co. v. A. C. White Lumber Co. (D. C.) 41 F.(2d) 60. The claim of plaintiff in this regard will therefore be denied.

The pleadings fail to disclose any reference to plaintiff's present claim for interest upon monthly deposits exacted by the holding company from its subsidiary to meet the semiannual bond interest payments as they matured. Were plaintiff's rights clear the failure to state the grounds for relief in the pleadings and prayer for relief would not be fatal. It is the claim of the defendant that these monthly deposits are in accordance with the common practice of holding companies for the purpose of assuring a fund out of which the bond interest of a subsidiary may be promptly met at maturity. The right to make these exactions may be doubtful, but, in view of the large and numerous financial transactions between the controlling company and the subsidiary, it is the conclusion of the court that the right of recovery is not so clear as to justify allowance therefor in the present state of the pleadings.

A decree may be presented for signature in conformity with the foregoing opinion.

### Note 1.
### (Appendix A)
### Dividend Payments

| | | |
|---|---|---|
| 1912 | Dec. 31 | $ 42,000. |
| 1913 | Dec. 17 | 42,000. |
| 1914 | Dec. 12 | 36,000. |
| 1915 | Oct. 29 | 36,000. |
| 1916 | Sep. 22 | 24,000. |
| | Dec. 26 | 27,000. |
| 1917 | Dec. 22 | 36,000. |
| 1918 | Jun. 25 | 6,000. |
| 1919 | Nov. 29 | 72,000. |
| 1920 | Aug. 28 | 60,000. |
| | Dec. 12 | 48,000. |
| 1921 | Dec. 20 | 48,000. |
| 1922 | Dec. 20 | 72,000. |
| 1923 | Dec. 10 | 30,000. |
| | | $579,000. |

### Note 2.
### (Appendix B)

"Sec. 23. If the directors of any company formed under this act shall declare or pay any dividend when the company is insolvent, or the payment of which would render it insolvent, or which would diminish the amount of its capital stock, they and all stockholders who shall knowingly accept or receive such dividend, shall be jointly and severally individually liable for all the debts of such company then existing, and for all that shall be thereafter contracted while they shall respectively continue stockholders or in office." See section 8553, Comp. Laws of Mich. 1915, now Comp. Laws Mich. 1929, § 11313.

528

## Note 3.
### Exhibit 27.
### Summarized Income Account 1912-1925.

Depreciation and excess net retirements based on actual cost to operating company (With recognition of depreciation prior to 1912).

| Year | Gross revenue 1 | Operating expenses 2 | Additional direct maintenance and disallowed items 3 | Depreciation as booked (charged to operating expense) 4 | Adjusted operating expenses 2+3-4 5 | Depreciation and excess net retirements 6 | Adjusted operating expense plus depreciation and excess net retirements 5+6 7 | Net operating revenue 1-7 8 | Interest * 9 | Net to stock equity 8-9 10 | Accumulated deficit before dividends 11 | Dividends paid (accumulated) 12 | Accumulated final deficit 11+12 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1912 | 327,543.97 | 209,589.70 | 893.64 | — | 210,483.34 | 44,644.38 | 255,127.72 | 72,416.25 | 77,958.94 | 5,542.69r | 373,932.49r† | 42,000r | 415,982.48r |
| 1913 | 361,513.51 | 230,734.41 | 3,000.00 | — | 233,734.41 | 45,598.22 | 279,332.63 | 82,180.88 | 82,211.72 | 30.84r | 374,013.32r | 84,000r | 458,013.32r |
| 1914 | 365,642.62 | 234,119.71 | 2,168.35 | — | 236,288.06 | 45,872.86 | 283,160.92 | 83,481.70 | 83,768.88 | 287.18r | 374,300.50r | 120,000r | 494,300.50r |
| 1915 | 390,563.31 | 242,145.66 | 702.80 | — | 242,848.46 | 46,025.22 | 288,873.68 | 101,689.63 | 86,498.54 | 15,191.09 | 359,109.41r | 156,000r | 505,109.41r |
| 1916 | 443,412.73 | 307,086.62 | 5,612.33 | 24,367.50 | 288,331.45 | 48,011.88 | 336,293.33 | 112,119.40 | 87,284.40 | 24,835.00 | 334,274.41r | 207,000r | 541,274.41r |
| 1917 | 473,664.37 | 339,107.68 | 5,986.59 | 17,456.95 | 327,637.32 | 41,760.40(1) | 369,397.72(1) | 104,266.65 | 91,986.51 | 12,280.14 | 321,994.27r | 243,000r | 564,994.27r |
| 1918 | 473,671.20 | 351,206.77 | 142.95 | 20,264.37 | 331,085.35 | 42,000.11 | 373,085.46 | 100,585.74 | 96,884.03 | 3,701.71 | 318,292.56r | 249,000r | 567,292.56r |
| 1919 | 591,886.32 | 441,332.30 | | 20,350.32 | 420,981.98 | 41,995.00 | 462,976.98 | 128,909.34 | 98,970.06 | 34,999.28 | 283,353.28r | 321,000r | 604,353.28r |
| 1920 | 638,527.83 | 468,448.53 | 84.63 | 19,497.41 | 449,035.75 | 42,305.86 | 491,341.61 | 177,186.22 | 95,372.55 | 81,813.67 | 201,539.61r | 429,000r | 630,539.61r |
| 1921 | 578,605.44 | 426,314.52 | 6,619.31 | 22,191.93 | 410,741.90 | 39,005.27 | 449,747.17 | 128,858.27 | 100,714.08 | 28,144.19 | 173,395.42r | 477,000r | 650,395.42r |
| 1922 | 593,192.68 | 413,572.07 | 1,145.20 | 20,194.42 | 394,522.85 | 53,084.52(2) | 447,607.37(2) | 145,585.31 | 99,365.00 | 46,220.31 | 127,175.11r | 549,000r | 676,175.11r |
| 1923 | 569,875.02 | 437,282.88 | 6,154.77 | 21,988.76 | 421,450.89 | 40,939.40 | 462,420.29 | 107,454.73 | 101,997.63 | 5,457.10 | 121,718.01r | 579,000r | 700,718.01r |
| 1924 | 464,016.95 | 387,090.28 | 9,666.92 | 22,417.24 | 374,339.96 | 49,098.53(3) | 423,438.49(3) | 40,578.46 | 105,686.02 | 65,107.56r | 186,825.57r | 579,000r | 765,825.57r |
| 1925 | 373,588.16 | 356,482.87 | 184.31 | 26,733.87 | 329,883.31 | 40,788.09 | 370,671.40 | 2,916.76 | 105,089.80 | 102,173.04r | 288,998.61r | 579,000r | 867,998.61r |
| Total | 6,680,704.11 | 4,844,464.00 | 42,311.80 | 215,460.77 | 4,671,315.03 | 621,159.74 | 5,292,474.77 | 1,388,229.34 | 1,308,788.16 | 79,441.18 | | | |

(1) Includes $1,153.86 excess net retirement.
(2) Includes $14,544.84 excess net retirement.
(3) Includes $3,663.12 excess net retirement.

* Includes income tax on bond interest { 1923—$1,684.84 ; 1924—$1,442.78 & capital stock tax { 1917—$595.39 ; 1918—$242.00 ; 1925—$1,805.83

† This figure includes the deficit at beginning of year $368,439.79.

r=red ink

Note 4.

Plaintiff's Exhibit 30.

Summarized Income Account 1902–1911.

Depreciation and excess net retirements based on total cost to operating company.

| Year | Gross revenue | Operating expenses | Additional direct maintenance and disallowed items | Depreciation as booked | Adjusted operating expenses | Depreciation and excess net retirements on basis of total cost to operating company | Adjusted operating expense plus depreciation & excess net retirements (5—6) | Net operating revenue | Interest | Net to stock equity | Accumulated deficit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 1902 | 143,735.40 | 98,784.82 | — | — | 98,784.82 | 39,796.06 | 138,580.88 | 5,154.52 | 44,518.24 | 39,363.72r | 39,363.72r |
| 1903 | 176,951.56 | 150,547.36 | — | — | 150,547.36 | 39,796.06 | 190,343.42 | 13,391.86r | 63,615.00 | 77,006.86r | 116,370.58r |
| 1904 | 186,069.01 | 161,394.07 | — | — | 161,394.07 | 39,819.92 | 201,213.99 | 15,144.98r | 73,169.61 | 88,314.59r | 204,685.17r |
| 1905 | 213,224.03 | 145,213.46 | — | — | 145,213.46 | 39,819.92 | 185,033.38 | 28,190.65 | 80,237.77 | 52,047.12r | 256,732.29r |
| 1906 | 241,859.80 | 145,922.94 | — | — | 145,922.94 | 41,318.37 | 187,241.31 | 54,618.49 | 79,850.23 | 25,231.74r | 281,964.03r |
| 1907 | 258,566.33 | 157,653.83 | — | — | 157,653.83 | 41,318.37 | 198,972.20 | 59,594.13 | 80,642.12 | 21,047.99r | 303,012.02r |
| 1908 | 262,342.37 | 153,787.80 | — | — | 153,787.80 | 42,270.26 | 196,058.06 | 66,284.31 | 79,249.73 | 12,955.42r | 315,977.44r |
| 1909 | 282,091.30 | 169,849.81 | — | — | 169,849.31 | 42,270.26 | 212,119.57 | 69,971.73 | 78,912.25 | 8,940.52r | 324,917.96r |
| 1910 | 294,310.75 | 199,243.81 | — | — | 199,243.81 | 42,525.02 | 241,768.83 | 52,541.92 | 78,319.65 | 25,777.73r | 350,695.69r |
| 1911 | 316,754.65 | 214,102.69 | — | — | 214,102.69 | 42,525.02 | 256,627.71 | 60,126.94 | 77,871.04 | 17,744.10r | 368,439.79r |

r=red ink

Note 5.
Exhibit 37.

Tangible Property Account and Depreciation Reserve on Basis of
Total Cost to Operating Company
(with Recognition of Depreciation Prior to 1912)

| Year | Fixed Tangible Property 1 | Balance in Depreciation Reserve 2 | Column 1 minus Column 2 3 |
|---|---|---|---|
| 1902 | $1,462,641.42 | $ 39,796.06 | $1,422,845.36 |
| 1903 | 1,463,436.71 | 79,592.12 | 1,383,844.59 |
| 1904 | 1,463,436.71 | 119,412.04 | 1,344,024.67 |
| 1905 | 1,463,436.71 | 159,231.96 | 1,304,204.75 |
| 1906 | 1,506,289.68 | 195,543.67 | 1,310,746.01 |
| 1907 | 1,506,289.68 | 236,862.04 | 1,269,427.64 |
| 1908 | 1,535,233.64 | 279,132.30 | 1,256,101.34 |
| 1909 | 1,535,233.64 | 321,402.56 | 1,213,831.08 |
| 1910 | 1,547,450.26 | 364,286.55 | 1,183,163.71 |
| 1911 | 1,547,450.56 | 405,811.57 | 1,141,638.99 |
| 1912 | 1,602,356.57 | 441,973.90 | 1,160,382.67 |
| 1913 | 1,648,171.82 | 487,009.50 | 1,161,162.32 |
| 1914 | 1,661,492.81 | 532,882.36 | 1,128,610.45 |
| 1915 | 1,667,121.94 | 577,806.36 | 1,089,315.58 |
| 1916 | 1,722,617.37 | 620,225.81 | 1,102,391.56 |
| 1917 | 1,615,044.02 | 526,997.21 | 1,088,046.81 |
| 1918 | 1,651,930.22 | 553,570.08 | 1,098,360.14 |
| 1919 | 1,650,959.88 | 578,727.59 | 1,072,232.29 |
| 1920 | 1,668,051.78 | 620,116.32 | 1,047,935.46 |
| 1921 | 1,632,403.58 | 541,540.08 | 1,090,863.50 |
| 1922 | 1,609,427.10 | 562,378.56 | 1,047,048.54 |
| 1923 | 1,665,487.05 | 594,086.86 | 1,071,400.19 |
| 1924 | 1,663,465.77 | 596,512.85 | 1,066,952.92 |
| 1925 | 1,674,688.57 | 637,520.22 | 1,037,168.35 |

Note 6.
Exhibit 33.

Estimated Annual Rates of Accrual for Depreciation Reserve.

| | Starting on new property |
|---|---|
| Bridges | 2.50 |
| Track and roadway | 1.80 |
| Third rail and trolley | 3.33 |
| Pole line | 5.00 |
| Power house and shops | 2.00 |
| Car barns | 2.00 |
| Substations | 2.00 |
| Misc'l Bldgs | 2.00 |
| Resort buildings and docks | 2.00 |
| Power house equipment | 6.00 |
| Substation equipment | 6.00 |
| Shop machinery | 3.33 |
| Cars and equipment | 4.00 |
| Incidentals | 3.00 |
| Engineering and superintendence | 3.00 |
| Grand Haven Street Railway | 1.80 |
| Muskegon Terminal | 2.00 |
| Automobiles | 8.00 |